(No. 20304.—

FRANK J. WARD, Appellant, *vs.* THE CITY OF CHICAGO *et al.* Appellees.

*Opinion filed December 18, 1930.*

THOMAS D. NASH, and MICHAEL J. AHERN, for appellant.

SAMUEL A. ETTELSON, Corporation Counsel, (EDWARD C. HIGGINS, LEONARD ETTELSON, HERBERT DECKER, and ALBERT H. VEEDER, of counsel,) for appellees.

Mr. COMMISSIONER EDMUNDS reported this opinion:

Appellant, Frank J. Ward, a tax-payer, elector and resident of the city of Chicago, filed his bill in the superior court of Cook county to enjoin the city of Chicago and its

mayor and comptroller, appellees, from issuing certain certificates of indebtedness. Appellees demurred to the bill and their demurrer was sustained. This appeal is from the resulting decree, which dismissed the bill for want of equity.

The bill sets forth the ordinance adopted by the city council of Chicago under which it is proposed to issue the certificates in question. By its terms the mayor and comptroller are authorized, in accordance with the provisions of a statute of the State of Illinois entitled, "An act authorizing cities having a population of 500,000 or more, and owning or operating a waterworks system to issue certificates of indebtedness, payable solely from revenue derived from the operation thereof, for the purpose of improving and extending such waterworks system," (Cahill's Stat. 1929, chap. 24, par. 1093, sub-pars. 14-18,) to execute and issue, in behalf of the city of Chicago, waterworks certificates of indebtedness for a total aggregate principal sum of $12,000,000. The ordinance prescribes the form of the proposed certificates, which state on their face that they are to be paid solely from revenues derived from the waterworks system of the city of Chicago, that they are for the purpose of paying the cost of improving and extending the waterworks system, and that they do not constitute an indebtedness of the city within any constitutional or statutory limitation. The ordinance describes the improvements and extensions which it is proposed to make from the proceeds of the certificates, and provides that upon and after its passage the entire revenue received from the operation of the waterworks system of the city shall be deposited in a separate fund designated as the "water fund of the city of Chicago," which fund shall be used only in paying the cost of maintenance and operation of such system, obligations of the city heretofore issued that are payable by their terms from such revenue, whether in the form of certificates, bonds or otherwise, and the certificates issued under the ordinance. The bill alleges that the statute above re-

ferred to, pursuant to which the ordinance was passed, violates the provisions of section 12 of article 9 of the constitution of the State of Illinois because the water certificates are a corporate indebtedness, and the General Assembly exceeded its power in providing in said statute that "certificates of indebtedness issued under the provisions of this statute shall be payable solely from the revenues derived from such waterworks system," and that "such certificates shall not in any event constitute an indebtedness of such municipality within the meaning of the constitutional provisions or limitations;" that the ordinance is consequently invalid, and that by reason of the invalidity of the statute and ordinance the certificates of indebtedness are not valid obligations of the city of Chicago and their sale or negotiation should be enjoined. It is alleged upon information that the city of Chicago was not at the time of the enactment of the statute, and is not now, indebted in any manner or for any purpose to an amount, including existing indebtedness and the amount of the proposed certificates, in the aggregate exceeding five per cent of the value of the taxable property therein ascertained by the last assessment for State and county taxes, and that the indebtedness of the city of Chicago is a great deal less than a sum equivalent to five per cent of the value of the taxable property therein ascertained by the last assessment for State and county taxes. The bill further alleges that the ordinance and the enabling act are void because the certificates are an indebtedness within the constitutional limitation, yet nevertheless neither the enabling act nor the ordinance provides for the collection of a direct annual tax, in accordance with the provision of section 12 of article 9 of the constitution.

Would the proposed certificates create an indebtedness against the city of Chicago within the meaning of the constitutional provision invoked by appellant? This court recently considered that provision in *Maffit* v. *City of Decatur,* 322 Ill. 82. In that case a tax-payer filed a bill praying that

a certain contract between the city of Decatur and the Decatur Water Supply Company, a corporation, might be declared void. The city of Decatur, already owning a water supply system worth approximately $1,000,000 and comprising a pumping station, filtration plant, water mains and a dam in the Sangamon river by which water was stored for the city's use, was forced to construct, at a cost of $807,-683.56, a larger dam in order to impound sufficient water to meet the growing needs of the city. The completed dam, it was discovered, would impound water to such.a height that 3300 acres of land would be inundated, and a considerable portion of the land would have to be cleared before it could be used for a reservoir. Unless the city acquired the right to inundate this land and make certain changes and improvements the dam could not be made effective. Construction of this larger dam had, however, exhausted the city's debt-incurring power. A domestic corporation, the Decatur Water Supply Company, was formed, having for its objects, among others, to acquire land for a reservoir for the storage of water, to construct and maintain such a reservoir, to operate a system of waterworks, and to supply water for the city of Decatur. The city of Decatur and this water company then entered into the contract against which the bill was directed. By the terms of this contract the water company agreed to acquire either the land necessary for a reservoir or the right to flood that land, to clear the land to be flooded, to defend all suits and pay all final judgments for damages to land caused by impounding the water, and to pay the cost and expense of altering roads and highways, raising bridges, constructing new bridges, and of all other work necessary to maintain the water in the reservoir at the necessary height. The engagements of the water company were, however, limited to a total expenditure of $1,000,000. The city agreed to maintain the dam, to make provision for taking water from the reservoir by the construction of the necessary intakes,

to pump water from the reservoir, and to supply it through its mains to customers at reasonable rates to be fixed by the city. The contract provided that all water rents should be deposited in some bank to the joint account of the parties thereto, to be withdrawn upon warrants executed by their proper officers; that out of such rents the city should first be paid a sum equal to the expense incurred by it during the preceding month in the operation of the water system, exclusive of the impounding dam and the reservoir, and that the remainder should be divided between the city and the water company in the proportions of ten and ninety per cent, respectively. The contract was to run for thirty years, but it provided that the water company might terminate it at any time after a certain date, upon thirty days' written notice to the city, if the company's annual income did not equal $135,000 and the city refused to pay the deficit within thirty days after such notice. It was further provided that in the event of the termination of the joint undertaking, or if the company were prevented from receiving its proportion of the water rents to the extent of the minimum prescribed, the city was required to open the flood gates of the impounding dam and reduce the water in the river to its level before the construction of the larger dam. Other provisions gave the city the right to pass on all plans and contracts in connection with the contemplated work and to have access to the meetings and records of the water company. In the event that payment of money to the water company under the provisions of the contract were enjoined or the contract terminated by the water company, the latter nevertheless granted the city the option to require the water company to observe the contract on its part upon payment by the city to the company of a certain prescribed rate for water pumped each month. The city was also given the option, within thirty years, to purchase the company's interest under certain terms.

It was contended in the *Decatur case* that the arrangement between the city and the water company was merely a scheme or device to evade the limitation prescribed by section 12 of article 9 of the constitution, and this court granted that if the contract in question created an indebtedness beyond the limitation so fixed it was void. We held, however, that no indebtedness was created, saying: "Undoubtedly that contract, in its main purpose, grew out of the city's need for additional facilities to supply its citizens with water throughout the entire year. Those facilities it was sought to provide by the construction of a larger dam and the acquisition of land for a reservoir. The city was, however, unable to pay for both of these improvements at the time. The city owned the dam, and although it might eventually acquire the reservoir site of the water company, it does not necessarily follow, under the terms of the contract, that it will do so. The only absolute and fixed right under the contract is that of the city to flood the land of the water company for a certain rate of compensation to be paid out of the water rates derived from the consumers of water residing in the city. There is no showing by appellant that an indebtedness is or will be created by this method of paying the water company which exceeds or will exceed the constitutional limit for the city. No obligation is imposed upon the city to pay the water company's compensation. If in any given year the company should fail to realize as its share of the water rates the minimum prescribed by the contract no liability on the part of the city to pay the deficit would arise. The city might choose to pay the deficit, but if it refused to do so no suit to recover it could be maintained by the company."

It is apparent that the general situation in the present case is similar to that in the *Decatur case,* and that the obligation which it is proposed to create here cannot be said to be, from the standpoint of the city, fundamentally different from the one which was there involved. There the city al-

ready had a complete water system in operation, but the addition of new elements was necessary if it was to be made adequate to meet the city's growing needs. Here the proposed new elements take a different form but their purpose is the same. There the existing disposition of water rents was done away with and all moneys received from the system went into one fund, out of which certain operating expenses were taken. Although the value of the addition to the plant was no greater than that of the remainder of the plant exclusive of the addition, an apparently arbitrary percentage of nine-tenths of the remainder of this fund was then allotted to the water company which financed the addition. Here all revenue received from the water system is to be deposited in a separate fund, out of which are to be paid all maintenance and operating expenses, and the remainder is to be available to pay back those who finance the proposed extensions by purchasing the certificates. There the amount coming into the water fund was dependent upon rates fixed by the city, and the amount in the water fund here will be determined in the same manner. There compensation for the water company came solely from the water fund thus created and no obligation to pay was imposed upon the city. Here no portion of the plant is pledged for payment and holders of the certificates have no recourse save out of the proposed water fund. That the obligation of the city arose there out of a simple reciprocal contract, whereas here it would be represented by documents in the nature of negotiable notes, can make no difference so far as the question at issue is concerned. If no indebtedness within the constitutional inhibition was created there, no substantial reason exists for saying that any would be created here.

The main reliance of appellant is upon the case of *City of Joliet* v. *Alexander,* 194 Ill. 457. The city of Joliet, owning a system of waterworks, had passed an ordinance providing for extensions thereto. To pay for these exten-

sions water fund certificates were issued. These certificates were secured by a mortgage which covered both the existing system and the extensions constructed under the ordinance. The court properly held that an indebtedness within the constitutional prohibition was thereby created. Counsel for appellant in the present case lay considerable stress upon certain language of the opinion to the effect that indebtedness within such constitutional prohibition may be created by pledging an existing income of the city, arguing that in the present case there can be no way of determining how much income would be attributable to the enlargement of the system when made or how much would be attributable to the new rates to be put into effect; that the so-called new income cannot be segregated from the present income; that the present income will thereby be taken away and lost, and that so cutting off and pledging it will create an indebtedness within the meaning of the language invoked. The position thus taken seems to be that pledging the water fund creates indebtedness within the constitutional prohibition unless the pledge is confined to such precise income as can be directly traced to the particular new physical element of the plant to pay for which the obligation secured was issued, leaving the original income in effect intact and usable by the city for other purposes altogether. The *Decatur case* is decisive against the soundness of such a position. There the income from the original plant was in effect cut off and lumped into the fund resulting from the operation of the plant as enlarged. It is not apparent that any effort was there made to preserve such original income intact or exempt it in any manner or degree from the claim of the water company, or that moneys made available to the water company under the contract were at all limited to income traceable to the elements of the plant which it had financed.

A number of other cases are cited by appellant, including *Village of East Moline* v. *Pope,* 224 Ill. 386, *Schnell* v.

*City of Rock Island,* 232 id. 89, *Lobdell* v. *City of Chicago,* 227 id. 218, and *Leonard* v. *City of Metropolis,* 278 id. 287. These cases involved facts clearly distinguishable from those disclosed by the record now before us and cannot be held to govern the determination of the issues here presented.

The chancellor rightly dismissed the bill for want of equity, and the decree of the superior court is therefore affirmed.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Edmunds is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Decree affirmed.*