24 P.(2d) 253

**SEWARD v. BOWERS, Mayor, et al.**

**No. 3897.**

Supreme Court of New Mexico.

June 30, 1933.

Fred C. Stringfellow, of Raton, for appellant.

F. S. Merriau, of Raton, for appellees.

ZINN, Justice.

Appellant, a resident taxpayer and water user of Springer, N. M., sought to enjoin the appellees, the mayor and board of trustees of the town of Springer, from making, executing, and delivering to the Reconstruction Finance Corporation $37,500 revenue bonds for a loan of an equal amount, the bonds to be paid exclusively from net revenues to be derived by the municipality from the operation of its municipally owned waterworks system; the money to be used in the betterment, replacement, and improvement of the present system.

The proposed bonds are to be issued pursuant to Laws 1933, c. 57. (House Com. Sub. for S. B. § 17.)

The appellees demurred to the complaint, the court sustained the demurrer, entered judgment denying the relief sought, and the case is before this court on appeal.

Considering each proposition of law as presented, we first come to the appellant's contention that the proposal to issue the bonds is the contracting of a "debt" within the meaning of N. M. Const. art. 9, § 12, and that without submitting the question to a vote of the taxpaying electors, and without a provision to levy a tax upon all taxable property within such town sufficient to pay the interest and to extinguish the principal, is contrary to N. M. Const. art. 9, § 12.

The rule applicable in the instant question is well stated in 19 R. C. L. § 281, p. 985: "It is generally held that a limitation upon municipal indebtedness is not violated by an

obligation which is payable out of a special fund, if the municipality is not liable to pay the same out of its general funds should the special fund prove insufficient, and the transaction by which the indebtedness is incurred cannot in any event deplete the general resources of the municipality. But the mere fact that a special fund is created for payment is not enough to make the obligation valid. The creditor must look to the fund alone for his recompense; and if the municipality is liable generally, an indebtedness is created within the meaning of the debt limit provisions. * * * When the receipts from a municipal water supply are pledged to meet an indebtedness incurred in establishing the waterworks, and the creditor has no right to look beyond this source for payment, it has been held that there is no indebtedness in the constitutional sense."

See the following cases: Quill v. Indianapolis, 124 Ind. 292, 23 N. E. 788, 7 L. R. A. 681; City of Laporte v. Gamewell Fire Alarm Tel. Co., 146 Ind. 466, 45 N. E. 588, 35 L. R. A. 686, 58 Am. St. Rep. 359; Kelly v. Minneapolis, 63 Minn. 125, 65 N. W. 115, 30 L. R. A. 281; Vallelly v. Park Commissioners, 16 N. D. 25, 111 N. W. 615, 15 L. R. A. (N. S.) 61.

The idea of a "debt" in the constitutional sense is that an obligation has arisen out of contract, express or implied, which entitles the creditor unconditionally to receive from the debtor a sum of money, which the debtor is under a legal, equitable, or moral duty to pay without regard to any future contingency.

Keeping in mind the rule that there is no "indebtedness" in the constitutional sense unless there is either a legal, equitable, or moral obligation on the part of the town of Springer to pay the bondholders of the proposed issue out of other moneys than the net revenue from the improved waterworks system, we find that section 5 of the act under which it is proposed to issue the bonds is as follows: "It is hereby declared that revenue bonds, issued under the provisions of this Act, shall not be considered or held to be general obligations of the municipalities issuing them, shall be collectible only out of the net revenues derived from the operation of the utility whose income is so pledged, and each of the bonds of any issue of revenue bonds so issued under the provisions of this Act shall recite on its face that it is payable and collectible solely from the revenues derived from the operations of the utility, the income of which is so pledged, and that the holders thereof may not look to any general or other fund for the payment of principal and interest of such obligation."

This section of the legislative act makes it clear that the proposed bonds are not to be considered or held to be general obligations of the municipality, are collectible only out of the net revenues derived from the operation of the utility whose income is pledged for that purpose; the bonds on their face are to recite that the principal and interest are payable and collectible solely from the revenues derived from the operation of the utility, and such recital is notice to the holder that he may not look for his recompense

to any general or other fund for the payment of principal or interest. The city incurs no liability payable out of its tax or other revenues on account of the issuance of the revenue bonds, and the act negatives any such liability.

The town of Springer, as such, has no moral, equitable, or legal duty to pay out of any fund except the net revenues of the plant which is a special fund out of which the revenue bonds are to be retired. If the municipal officers discharge the duty devolved upon them by the act, namely, to maintain rates sufficient to raise revenues to pay the interest and principal on these bonds, they have fulfilled their duty. In the event of their failure to do so, an action in mandamus can be brought pursuant to section 6 of said act to compel them to perform their duty; in no event is there any financial liability created which will impose a debt upon the municipality. The debtor pledged the net revenues. The creditor knows exactly where to look for his money, and knows he cannot look elsewhere. The legal and equitable obligations are clear and well defined, and the moral obligation in this case does not go beyond the legal or equitable.

In the case of State v. Regents of University of New Mexico, 32 N. M. 428, 258 P. 571, an injunction was sought to restrain the regents of the University of New Mexico from issuing $190,000 worth of building and improvement bonds, the interest and principal of which were to be paid out of the income from University land, without mortgaging the land in any manner. It was contended that the issuance of said bonds was contrary to N. M. Const. art. 9, § 8, in that there was no provision for an annual tax levy sufficient to pay interest and provide a sinking fund, and that the creation of such debt had not been submitted to a vote of the people for approval (identical with the appellant's contention in this case, though construing a different section of our Constitution). We said: "The Legislature therefore had power to authorize the University to make such use of its income as was deemed best. This is all that is contemplated by chapter 47, Laws 1927, and all that is proposed by the University. It proposes to contract with its bondholders that it will appropriate out of its income sufficient sums of money to pay interest and provide a sinking fund for the retirement of the bonds. It does not propose to mortgage its property in specie. It simply agrees to pay out of its income. How it can be said that this will be an obligation of the state, we cannot understand. This is simply a contract of the University to pay out of a designated fund when received. It is no more an obligation of the state than would be the obligation to pay the salaries of the University faculty." State v. Regents of University of New Mexico, 32 N. M. 428, at page 430, 258 P. 571, 572.

In purpose and effect nothing more is proposed here. The town of Springer, desiring to extend and improve its municipally owned water system, proposes to issue bonds in the sum of $37,500 with which to make such ex-

tensions, betterments, and repairs, and proposes to pledge the net revenue from such water system to pay the interest and provide a sinking fund to retire said bonds, and to maintain rates sufficient to provide revenues for such purpose. That is what is authorized by Laws 1933, c. 57. In its effect it is not a "debt" of the town, simply an agreement to pay out of the net revenues of the waterworks when received, and is no more a "debt" of the municipality within the constitutional sense than would be a debt incurred to pay for the ordinary cost of repairing a water main.

The appellant contends that the statute requires the town to establish and collect water rates sufficient to cover the payments to become due, and, failing to collect sufficient to meet the interest and sinking fund requirements, the town would become generally obligated. We see no merit in such theory. The undertaking of the town of Springer is not a guaranty or pledge that the interest or the bonds will be paid, but only a pledge that the town of Springer shall establish a rate that will do so. Section 6 of the act provides that the governing body issuing the bond must establish such rates for services rendered as will create an income sufficient to pay all reasonable expenses of operation, and create a net revenue which shall be sufficient to pay interest coupons when due, and provide out of such net revenues a sinking fund which shall be adequate to discharge said bonds as and when they shall mature, and such rates must be continuously maintained un-

til the bonds are retired, and optional at the end of ten years, and due in not more than twenty years. The fixing of a proper rate and the application of the revenue in the manner directed by law constitutes the legal, equitable, and moral duty of the town board of the municipality, and, failing in that, the bondholder may apply to the court to have such rates established and applied. The charge is upon those who use the water, and not upon the taxpayers, and the taxpayer cannot be called to aid the water user in the retirement of these bonds. The credit of the city is not extended, nor is any money which is derived from taxation or other existing sources of revenue pledged in the payment of the interest or principal upon the bonds, and the city cannot be coerced into applying any of its general revenue.

It is abundantly clear that no indebtedness can possibly result against the town of Springer from the issuance of the revenue bonds, and these bonds are not within the inhibition of the Constitution.

The weight of authority is in accord with this view. Note, 72 A. L. R. 687.

The next question presented by the complaint and demurrer is whether or not the issuance of the contemplated revenue bonds by the town of Springer is in contravention of the provisions of the N. M. Const. art. 9, § 13, which is as follows: "No county, city, town or village shall ever become indebted to an amount in the aggregate, including existing indebtedness, exceeding four per centum on the value of the tax-

able property within such county, city, town or village, as shown by the last preceding assessment for state or county taxes; and all bonds or obligations issued in excess of such amount shall be void; provided, that any city, town or village may contract debts in excess of such limitation for the construction or purchase of a system for supplying water, or of a sewer system, for such city, town or village."

Whether the term "indebtedness" referred to in this section of the Constitution is the same as the term "debt" in the previous section need not be determined herein, for the apparent reason that the contemplated revenue bonds, if they create an "indebtedness," within the meaning of N. M. Const. art. 9, § 13, are clearly within the exemption permitting any city, town, or village to contract debts in excess of such limitation for the construction or purchase of a system for supplying water.

N. M. Const. art. 9, § 13, which limits the amount of indebtedness which a city, town, or village may contract, specifically exempts debts contracted for the purpose of the construction or purchase of a system for supplying water from the operation of the 4 per cent. limitation, and there is no limitation imposed upon the amount of indebtedness which may be contracted for such purpose. City of Albuquerque v. Water Supply Co., 24 N. M. 368, at page 377, 174 P. 217, 5 A. L. R. 519; Lanigan v. Gallup, 17 N. M. 627, 131 P. 997.

Whether revenue bonds issued by a municipality for other purposes than supplying water or a sewer system are such as would be valid or void under N. M. Const. art. 9, § 13, and are within the prohibition, we do not decide in this instance.

The next issue presented is, that no authority exists to pledge the revenue of the existing plant as well as the net revenues from the proposed improvements to the payment of interest and retirement of the bonds, and that such pledge constitutes a "debt" within the meaning of our Constitution.

We see no merit in this theory. The town, under the law, may pledge the present revenue from the existing plant, and can certainly pledge the future income of the enlarged or improved plant. It would be a physical impossibility to determine what portion of the proposed revenue is attributable to the improved plant in its entirety, to the improvements alone, or to the present plant.

A case in point on this question is that of Searle v. Town of Haxtun, in 84 Colo. 494, 271 P. 629. The Colorado court said:

"The plaintiff, however, conceding that if the town were acquiring a wholly new plant an agreement to pay out of the revenue thereof only and a pledge of the revenue therefrom to pay the purchase price would not be a debt, and that such an agreement and pledge of the revenue of the mere improvements would not be such, insists that an agreement to pay out of the income of property already acquired and a pledge thereof creates a debt within our Constitution, and distinguishes Shields v. Loveland,

supra [74 Colo. 27, 218 P. 913], by saying that there was, at the time of the issue of the Loveland bonds, no income from the plant of that city as it then stood.

"We see, however, no difference in substance between a promise or pledge of the future income of property which now has an income and a promise or pledge of the future income of property which now has none. If one would make the sum secured a debt, the other would. In either case the income is produced by property already owned by the city, which seems to be the condition which is condemned by the cases which plaintiff cites on this point."

The next issue presented by the complaint and demurrer is that the proposal to pledge the net revenues of the improved utility to the payment of the revenue bonds, and that said revenue bonds while outstanding shall have a right of priority of payment from the net revenue over existing general obligation bonds of said town, is violative of the provisions of article 14 of the Constitution of the United States, because the pledge of all net revenues of said utility to the payment of said revenue bonds impairs the rights of holders of existing outstanding water bonds.

We assume that the appellant has reference to the provisions of article 1, § 10, of the Constitution of the United States, being the section prohibiting the enactment of any law impairing the obligation of contracts.

It appears from the record that the present existing and outstanding water bonds are of the series of June 15, 1916, issued pursuant to article 11, c. 75 (§§ 3716–3722), 1915 Code, in the total sum of $21,000, with accruing interest, out of an original issue of $32,000, bearing interest at the rate of 5½ per cent. per annum, due on June 15, 1946, callable at any time after June 15, 1936, the proceeds of which bond issue were used by the municipality for the acquisition of the present plant.

The 1916 bonds are general obligation bonds, issued on the faith and credit of the community, payable out of a levy upon all the taxable property in the community and not in anticipation of any revenue from the waterworks. It would be as reasonable and logical to state that the town of Springer cannot apply the money derived from occupation tax licenses on the purchase of a fire truck or other fire extinguishing equipment, because the surplus of said occupation license revenue after meeting ordinary municipal requirements might be employed to retire existing bonds, and that the holder of existing bonds is entitled to have the same credited to the bond fund rather than permit the same to be applied on the fire truck, and therefore such expenditure of occupation tax revenues for fire fighting equipment is an impairment of the obligation of the rights of the bondholder contrary to article 1, § 10, of the United States Constitution, or of article 2, § 19, of our own Constitution.

The existing 1916 bonds have no present or future lien either upon the waterworks or the revenues therefrom, and the town of Springer has unquestioned power to pledge the net rev-

enues of the waterworks to retire the proposed bonds as and when issued.

In the event of default in the payment of any of said 1916 bonds now outstanding, either as to principal or interest, the holders thereof would be clearly limited in their remedy to the bond fund created by the tax levy provided by the ordinance under which the bonds were issued, and, in the event of its insufficiency, to a general judgment against the town of Springer for the amount due and a judgment levy as provided by the statutes of this state upon all of the taxable property within the limits of the town of Springer, the proceeds of which would be used to satisfy said judgment. The bondholders would have no specific lien upon the waterworks or the revenue therefrom even after judgment. They could not impound and sequester the revenues of said water system, nor would they have any right to seize by any known process the municipally owned waterworks. Their remedial rights would be limited to obtaining a judgment, and a mandatory order if need be, requiring the levying of a judgment tax upon all of the taxable property within the town for the purpose of paying said judgment.

The phrase "the faith and credit of the Village of Springer are hereby pledged for the punctual payment of principal and interest of this bond," contained in the 1916 bonds, has reference to the legal duty of the municipality to levy the tax provided for the payment of the interest and the retirement of the principal of the existing bonds, and did not in any manner contemplate a lien upon the waterworks that were purchased with the money derived from the sale of the 1916 bond issue, or a prior right to the revenue from said waterworks.

The appellant in his complaint contends that Laws 1933, c. 57, is in conflict with 1929 Comp. St. c. 90, art. 26 (Laws 1919, c. 47, as amended by Laws 1925, c. 51), in that the 1933 law requires the net revenue derived from the operation of the waterworks to be pledged to the payment of the proposed bonds, whereas chapter 90, art. 26, supra, requires said net revenues, after paying for the maintenance of the utility in good repair and the improvement and extension thereof and the payment of legitimate operating expenses, to be used in the payment of interest due on existing bonds, and that therefore the pledging of the net revenues to the payment of the interest and principal of the proposed bonds deprives the existing bondholders of a right to have the net revenues applied first to the payment of interest on the existing bonds before applying said net revenues as security for a new bond issue, and such action imposes a burden on the taxpayer to meet the interest requirement of the existing bond issue by a tax levy on his property. Appellees contend that chapter 57 repeals by implication 1929 Comp. St. c. 90, art. 26.

Whether the holders of the existing bonds have any vested right in the maintaining of the rates contemplated by article 26, supra, and the application of the revenue in the manner provided thereby, need not be determined

herein, as the appellant is not a bondholder, and no determination of that question would be binding on a holder of the 1916 bonds.

In 1919 the Legislature adopted a policy of retrenchment in municipal expenditure for the expansion of municipally owned utilities, limiting such expenditures to present earnings, and provided by Laws 1919, c. 137, now 1929 Comp. St. § 90-1001, that no incorporated city, town, or village be permitted to issue or negotiate any certificate of indebtedness, the payment of which is secured by a pledge of, or lien upon, any property, or the income or revenue derived therefrom, belonging to such municipality, and that all such certificates or other evidence of indebtedness issued contrary to the provisions thereof shall be void, and by Laws 1919, c. 47, directed the manner in which the revenues from municipally owned utilities must be applied.

Laws 1919, c. 47, made it the duty of the municipality to fix, establish, charge, and collect for the service rendered rents, rates, charges, and prices which will furnish sufficient funds to maintain the public utility in good repair, and sufficient funds to improve and extend the same, and to pay interest on the existing bonds, and it became the duty of the municipality from and after March 13, 1921, to not only fix, establish, charge, and collect for the service rendered by the public utility such rents, rates, charges, and prices as will furnish sufficient funds to meet the requirements of the act under the designated provisions of (a) and (b), but also (c), to wit, the creation of a sinking fund provided by the terms of the bonds or the law governing their issue. The Legislature in 1925, by chapter 51 (Comp. St. 1929, § 90-2603), relaxed its strict policy, and amended the law as follows:

"Sec. 3. It shall be the duty of every municipality coming within the provisions of this act to fix, establish, charge and collect for the service rendered by the public utility such rents, rates, charges and prices as will furnish sufficient funds to meet the requirements of this act and to apply such funds in the manner provided by this act and in no other manner; Provided, however, that the raising of sufficient funds, as provided by this act, to create a sinking fund shall be optional with the municipality."

This law became effective June 16, 1925. From March 13, 1921, to June 16, 1925, it was mandatory that municipalities establish rates sufficient to provide for the retirement of the principal of the outstanding bonds, and after June 16, 1925, it was optional with the governing municipal board to either establish the necessary rates to meet the requirements of (c) out of earnings of the plant or permit the creation of the sinking fund to retire the principal by a tax levy on property as provided by the ordinance issuing the bonds.

The policy adopted by chapter 57, Laws 1933, is not necessarily a reversal of the policy of the state adopted in 1919, but is a relaxation of the strict policy.

The apparent purpose of the 1933 law is an emergency measure to enable the municipalities of the state, where the present revenues of the utility are insufficient to pay for ex-

tensions or for betterments, and such municipalities have failed to set aside a sufficient sum out of past earnings to provide for betterments and extensions, and it is immediately urgent to make improvements and extensions, the municipality can make such improvements by the issuance of bonds secured by a pledge of future revenues. It will continue to be the duty of municipalities to conform to the provisions of 1929 Comp. St. c. 90, art. 26, in the conduct of municipal waterwork systems, except where they issue bonds under chapter 57, in which event article 26, supra, must give way to the 1933 act.

Laws 1919, c. 47, was enacted and designed to preserve municipally owned public utilities from being despoiled by incompetent or corrupt city officials. See Dreyfus v. Socorro, 26 N. M. 127, 189 P. 878. Its purpose and object was to require municipalities to keep in repair water systems constructed for the benefit of the inhabitants of the city, to require the charging of such rates as would enable the municipality to keep such plant in repair and improve and extend the same as and when needed, and to meet the interest and principal on the bonds issued for the construction or purchase of such system, and, upon failure of the municipal authorities to do so, the court may appoint a receiver upon the application of a taxpayer to carry out its purposes. This statute was designed to prevent the operation of the plant in an incompetent manner and to prevent an improper diversion of the revenues derived from the operation of the utility, and to guide and direct the application of such revenues. It was intended as a business code and rule to prevent extravagance and misapplication of revenues from public utilities and to direct the use of the surplus revenue, after meeting the cost of operation, to relieve the burden of the taxpayer rather than permit such revenues to be expended in new avenues of municipal adventure, and afforded taxpayers a judicial remedy for what might otherwise become an intolerable and oppressive political condition with reference to service by a municipally owned public utility. State ex rel. City of Roswell v. State Tax Commission et al., 34 N. M. 303, 280 P. 258. The Legislature has the unquestioned power to change the policy, and did, by the enactment of chapter 57, supra, so that the revenues from the waterworks which prior thereto were required by the statute to be placed in a fund to meet interest payments on existing bonds may be pledged to secure revenue bonds. The appellant, as a taxpayer, had no vested right in Laws 1919, c. 47, which the Legislature could not repeal.

Did the taxpayer or bondholder have any vested right in chapter 47, making it mandatory to maintain sufficient water rates to create a sinking fund which the Legislature could not take away by Laws 1925, c. 51? Apparently not.

If the Legislature first made it mandatory to provide and establish a rate sufficient to meet (a), (b), and (c), and subsequently amended the law leaving (c) optional, cannot it now make (b) likewise optional? We can see no distinction. Clearly chapter 47, Laws 1919, must give way to chapter 57, Laws 1933.

The 1933 act does not repeal 1925 Comp. St. c. 90, art. 26, but is supplemental thereto, and a method is provided to enable municipalities which have insufficient funds on hand to make the necessary improvements, and, when immediately necessary to raise funds for the improvement and extension of the utility thereof, may, in anticipation of future revenue, raise such needed funds by the issuance of revenue bonds, and provide that such bonds so issued will have a lien on the net revenue of said plant without burdening the taxpayer through the issuance of general obligation bonds. We deem such grant of power by the Legislature to the municipality as lawful and not in violation of article 26, supra.

The only other issue presented by the complaint and demurrer requiring our consideration is that the rates to be charged by a municipal corporation owning its water system are under the control of the State Corporation Commission and not under the jurisdiction of the municipal corporation, and therefore the Legislature cannot direct the town of Springer to contract the maintenance of rates in conformity with Laws 1933, c. 57.

We find no authority cited by appellant and no provision of the Constitution or statutes where such power is granted to the Corporation Commission, whereas Laws 1933, c. 57, the law in question, specifically grants such power to the municipal corporation in this instance, and makes it mandatory upon the town board to fix rates sufficient to meet the interest and the creation of a sinking fund, and is a proper grant of authority by the Legislature to a municipal corporation, and not in contravention of any constitutional powers of the State Corporation Commission.

The appellant concludes his brief with the contention that the issuance of revenue bonds pursuant to the legislative act under consideration, and the pledge of rates for a long period of time to retire such bonds, creates a grave situation where cities can incur indebtedness and get money from the government which the cities believe will never have to be repaid, and that with such frame of mind everyone is seeking to obtain money, which may cause regret on the part of the citizens of the town of Springer in the future, and therefore we should reverse the district court and grant the injunction.

This court is not concerned with the wisdom of the legislation here under consideration, or the necessity of improving the waterworks of the town of Springer, or of the certainty of the redemption of the bonds to be issued when due. The wisdom and necessity of legislation is a matter for the sound discretion of the Legislature of the state of New Mexico within the bounds of the Constitution, the desirability and necessity of improvements, betterments, and repairs of the Springer waterworks is a matter left to the good sense and conscience of the board of trustees of the town of Springer, and the value of the proposed bond issue as an investment is for the determination and judgment of the Reconstruction Finance Corporation. Personal beliefs, views, ideas, preju-

dices, or philosophies outside of the law cannot influence or guide our final decisions. We are here concerned only with reviewing the judgment of the lower court who held that the provisions of the legislative act under consideration are not violative of the state or Federal Constitution, and that the proposed proceedings of the board of trustees of the town of Springer, pursuant to said act, are legal, and can find no error in the judgment of the district court on the issues presented.

We conclude from the above that the lower court properly sustained the appellee's demurrer, and the judgment is affirmed, and the cause remanded to the district court, with directions to enforce its judgment. It is so ordered.

HUDSPETH, J., concurs in the result.

WATSON, Chief Justice (specially concurring).

I agree that N. M. Const. art. 19, § 13, presents no obstacle to the action sought to be enjoined. By a somewhat liberal, but I think proper, construction of that section, its limitation of aggregate indebtedness does not apply to a proposed extension or betterment of a system for supplying water.

So holding, the only constitutional provision here in question is article 9, § 12. I think that this section furnishes its own interpretation of "debt," as the word is there employed. I see no occasion to consult authorities at large as to the meaning of "debt,"

as used in constitutional limitations generally. And I desire to reserve my opinion as to its meaning in section 13 for a case which may involve that question.

Section 12 does not limit or concern itself with the amount or purpose of any debt. The debt being otherwise unobjectionable, section 12 prescribes two prerequisites: (1) Irrepealable ordinance provision for a tax levy sufficient to pay the interest and retire the principal; and (2) submission to referendum.

These two prerequisites go hand in hand. If one is necessary, the other is. It is "such debt" as is created by the irrepealable ordinance that must have popular sanction.

Evidently the Constitution makers, in framing section 12, did not have in mind any other form of debt or obligation than such as is to be met by taxation.

One of two results necessarily follows: Either revenue bonds are prohibited, because not in their nature payable from the proceeds of a tax levy, or they are not obnoxious to section 12, because not within its contemplation.

The first suggested operation of the section has little to recommend it. No one urges it. The legislative interpretation is against it, as disclosed not only by Laws 1933, c. 57, authorizing revenue bonds, but by Laws 1919, c. 137, prohibiting them. If the question were doubtful, as I think it is not, well-known principles would require us to sustain the legislative interpretation thus disclosed.

This forces me to the second suggested operation of section 12. In my opinion, the

conditions it imposes are applicable only to the ordinary debt pledging the faith and credit of the municipality and engaging its taxing power. Had the Legislature seen fit to authorize a mortgage of the plant, section 12 would not have been violated.

I concur in the affirmance of the judgment.

SADLER, Justice (concurring).

The great weight of judicial authority is committed to what is called the "special fund" doctrine. As applied to a situation like that now before us, it permits the pledging of the net revenues arising from the operation of a public utility to raise funds with which to pay for the purchase or construction thereof. 72 A. L. R. 687. The theory of the majority cases affirming the doctrine is that neither property nor income presently owned is required, nor is resort to the taxing power necessary, to support the pledge; hence no additional burden is cast on the taxpayer, and there is no debt created in the constitutional sense.

But in Joliet v. Alexander, 194 Ill. 457, 62 N. E. 861, although seemingly unnecessary to a decision of the case, the distinction seems first to have been emphasized that a pledge of the assured income from a presently owned plant along with the increased income of the plant as enlarged, for the purpose of making extensions or betterments, does create a debt in so far as the existing income is a part of the pledge.

The distinction thus suggested apparently commended itself as sound to the courts of certain jurisdictions, and has been followed by them. Hesse v. City of Watertown, 57 S. D. 325, 232 N. W. 53, 63; Garrett v. Swanton, 216 Cal. 220, 13 P.(2d) 725, 730; Bell v. City of Fayette, 325 Mo. 75, 28 S.W.(2d) 356; Hight v. City of Harrisonville, 328 Mo. 549, 41 S.W.(2d) 155; Miller v. City of Buhl, 48 Idaho, 668, 284 P. 843, 72 A. L. R. 682; Zachary v. City of Wagoner, 146 Okl. 268, 292 P. 345; City of Campbell, Mo., v. Arkansas-Missouri Power Co. (C. C. A. 8th Cir.) 55 F.(2d) 560; and possibly Byars v. City of Griffin, 168 Ga. 41, 147 S. E. 66, and Morton v. City of Waycross, 173 Ga. 298, 160 S. E. 330.

Investigation has satisfied me that the weight of authority is also against appellant on the distinction sought to be drawn in the Joliet Case as it is upon the general proposition first above mentioned. Certainly the Idaho and Oklahoma courts, as shown by the note in 72 A. L. R. 687, and apparently those of Georgia as indicated by the cases from that jurisdiction hereinabove cited, are on the minority side of the major proposition. Of course, in jurisdictions which prescribe, as the creation of a debt without surmounting constitutional barriers or as exceeding the constitutional limitation on amount, any attempt to pledge revenues for the *purchase* or *construction* of a new plant, it goes without saying that an attempted pledge of revenues from a plant *already owned* would fall within the interdiction of such a holding.

The opinion in Hesse v. City of Watertown, supra, a South Dakota case, was participat-

ed in by five judges. The four judges committing themselves on the soundness or unsoundness of the distinction drawn in the Joliet Case were evenly divided. Mr. Justice Burch, who concurred specially in the result announced by those supporting the distinction, had this to say on the subject: "The argument that, if such bonds are a debt of the city, they are necessarily issued 'on the credit of the corporation,' is far from convincing to my mind."

So that, for clear-cut holdings sustaining the distinction, so far as my research discloses, we are confined to the courts of California, Missouri, and the United States Circuit Court of Appeals of the Eighth Circuit. Against this line of decisions we find arrayed the courts of the following jurisdictions, to wit: Winston v. City of Spokane, 12 Wash. 524, 41 P. 888; Griffin v. City of Tacoma, 49 Wash. 524, 95 P. 1107; Barnes v. Lehi City, 74 Utah, 321, 279 P. 878; Lang v. City of Cavalier, 59 N. D. 75, 228 N. W. 819; City of Bowling Green v. Kirby, 220 Ky. 839, 295 S. W. 1004; Jones v. City of Corbin, 227 Ky. 674, 13 S.W.(2d) 1013; Ward v. City of Chicago, 342 Ill. 167, 173 N. E. 810, 812; Searle v. Town of Haxtun, 84 Colo. 494, 271 P. 629; City of Jerseyville, Ill., v. Connett (C. C. A. 7th Cir.) 49 F.(2d) 246, 249; and apparently also Brockenbrough v. Board of Water Commissioners, 134 N. C. 1, 46 S. E. 28, 34.

It is worthy of mention that the Joliet Case from Illinois, the first to sense and promulgate this distinction in and limitation on

the right to pledge revenues, has since been definitely rejected on this point in the jurisdiction which gave it birth. See Ward v. City of Chicago, supra, discussing which Circuit Judge Alschuler, speaking for the Eight Circuit Court of Appeals in City of Jerseyville, Ill., v. Connett, supra, said: "Now it is true that in that opinion reference was made to the Joliet Case, and the court stated that 'these certificates were secured by a mortgage which covered both the existing system and the extensions constructed under the ordinance. The court properly held that an indebtedness within the constitutional prohibition was thereby created.' But in the Ward Case the effect of a mortgage was not in issue, for there was no mortgage, and what was said in approval of the Joliet Case in no way conflicts with the views we have indicated respecting the conditions under which the Joliet decision was made. But the Ward Case is distinctly antagonistic to that part of the decision in the Joliet Case where it is said that the pledging of the income from the old plant for the payment of water fund certificates issued for enlargement or extension constituted the certificates an indebtedness of the municipality within the constitutional provision."

The opinion in Ward v. City of Chicago, in discussing the Joliet Case, said: "Counsel for appellant in the present case lay considerable stress upon certain language of the opinion to the effect that indebtedness within such constitutional prohibition may be created by pledging an existing income of the city, arguing that in the present case

398

there can be no way of determining how much income would be attributable to the enlargement of the system when made or how much would be attributable to the new rates to be put into effect; that the so-called new income cannot be segregated from the present income; that the present income will thereby be taken away and lost; and that so cutting off and pledging it will create an indebtedness within the meaning of the language invoked. The position thus taken seems to be that pledging the water fund creates indebtedness within the constitutional prohibition unless the pledge is confined to such precise income as can be directly traced to the particular new physical element of the plant to pay for which the obligation secured was issued, leaving the original income in effect intact and usable by the city for other purposes altogether. The Decatur Case [322 Ill. 82, 152 N. E. 602] is decisive against the soundness of such a position. There the income from the original plant was in effect cut off and lumped into the fund resulting from the operation of the plant as enlarged. It is not apparent that any effort was there made to preserve such original income intact or exempt it in any manner or degree from the claim of the water company, or that moneys made available to the water company under the contract were at all limited to income traceable to the elements of the plant which it had financed."

Garrett v. Swanton, supra, the per curiam opinion of the Supreme Court of California, is perhaps the most persuasive decision fol-

lowing the Joliet Case. It cites and appears to place considerable reliance on it as well as Schnell v. City of Rock Island, 232 Ill. 89, 83 N. E. 462, 14 L. R. A. (N. S.) 874, a later Illinois case, both preceding the Ward Case. The Ward Case apparently was not called to the attention of the California Supreme Court, although antedating its opinion in the Garrett-Swanton Case by almost two years.

There is language in the opinion in the California case suggesting a distinction between the facts of that case and the one at bar, to wit: "The contract here involved is not payable solely from the income of the improvement contemplated, but is payable from the revenues of the entire water system. Part of those revenues can, *and in fact must* [italics mine], be applied to the payment of the interest and principal on the bonds which is a general obligation of the city."

Here, as the record discloses, there is no pledge irrevocable or otherwise by the city of any part of the revenues of the existing water system to the retirement of the general obligation bonds of 1916. The fact that under the old ordinance the surplus revenues may have gone into the "bond fund" and have been used for such purpose does not alter the case so long as the city has not irrevocably dedicated the surplus revenues to that purpose.

The language of Chief Justice Brown of the Supreme Court of North Dakota in his dissenting opinion in Hesse v. City of Water-

town, supra (although upon the precise question now considered the court was equally divided), is quite apropos the contention that this diversion of surplus income from payment of general obligation bonds constitutes the transaction a "debt." In that case there were $750,000 of general obligation bonds outstanding, proceeds of which had been employed to purchase and equip the plant. It was proposed to issue $150,000 of new bonds for purchase of an extension and to pledge revenues of the plant as enlarged to secure the issue. The Chief Justice whose opinion was concurred in by Mr. Justice Sherwood said:

"The $750,000 of bonds previously issued were issued pursuant to elections called for the purpose. An inseparable part of such issue was that the governing body should provide for the levying of an annual tax sufficient to pay the interest and also the principal thereof when due. Rev. Code 1919, § 6998. If the city in fact in the past has taken the net income from the light plant and applied it in payment of the interest or principal of these bonds the city has just been donating that much to the taxpayers. It was under no obligation to apply the net income to the payment of the interest or principal of such bonds and thus relieve the taxpayers from the obligations imposed upon them by the ordinance providing for the annual tax sufficient to pay the interest and principal of the bonds. The city is under no obligation to continue this donation, and, if it now takes the income from the entire plant to provide for payment of the bonds

issued for the extension, this does not constitute any forbidden diversion of the income from the original plant. If it should become necessary to take a portion or even the whole of the income from the entire plant in order to pay the principal and interest of the $150,000 bonds issued for the extension, and in consequence thereof the tax to provide a sinking fund for the $750,000 bonds had to be levied, as required by the provisions of Rev. Code 1919, § 6998, that would not constitute the levying of any tax either direct or indirect for the payment of the bonds issued for the extension.

"Instead of taking any part of the net income of the original plant and applying it to the payment of interest or principal on the $750,000 bonds, the city council might have taken that entire net income and placed it in a 'hope chest' until it had accumulated to an amount sufficient to pay for the entire proposed extension. No taxpayer would have had any ground for complaint nor any right to require such net income to be applied in payment of the $750,000 bonds or interest thereon instead of being so accumulated, and, if the city could have accumulated the fund in advance for the proposed extension from the net profits from the operation of the lighting plant, I can see no reason why it cannot also take the current and future net income for the same purpose."

The reasoning of the cases sustaining the distinction drawn in the Joliet Case is that in subscribing to the special fund doctrine as applied to the pledge of revenues for the

*purchase* or *construction* of a new plant no hypothecation of any presently owned property or property right is involved. Thus it is argued that, the municipality having possessed no previous revenue from such source, neither property, nor revenue therefrom, belonging to the city, is pledged—a condition which, if shown to exist, would be deemed to result in creating a debt.

The transparency of this line of reasoning is at once exposed if we pause to consider it. For whatever form the transaction may take, whether a conditional sale with title reserved in seller until payment is complete, or otherwise, the municipality, by the retirement of its bonds as they mature or by meeting installments of the purchase price as they accrue, is constantly acquiring a progressively increasing beneficial or equitable ownership of the plant, an interest which may be the subject of transfer or assignment, and in the hands of a private holder could be reached to satisfy the claims of creditors. See Leonard v. City of Metropolis, 278 Ill. 287, 115 N. E. 813.

But the pledge keeps pace with acquirement of the interest, and the constitutional restriction runs abreast of them both, so that in final analysis the distinction drawn permits the very practice which it condemns. For prior to completion of payments the pledge is being satisfied in part and near the end almost wholly through income produced from property beneficially owned by the city. This reasoning, carried to its logical conclusion, would proscribe just as effectually the issuance of revenue bonds for the *purchase* of a new plant as an *extension* thereto. Nevertheless, practically a unanimity of opinion prevails in favor of their issuance for the former purpose.

I apprehend, if we at all times keep clearly in mind the fact that the "debt" resulting in the general obligation bonds was "created" at the time of their issuance in 1916, some needless confusion may be avoided. To be more specific, the whole controversy rages over whether the potential call upon the taxpayer to meet some portion of that originally created debt of which a fluctuating policy on the part of either the city or of the Legislature from time to time may have relieved him (by allocating to such purpose surplus income from the plant as it exists) so adds to his tax burden as to constitute the transaction the creation of a debt in the constitutional sense.

If it does, it must be the regeneration or re-creation of a debt originally created in 1916, never thereafter fully discharged, and one which necessarily has existed as a debt since the time of its origin. Until some irrevocable dedication to such purpose of other funds than those arising from taxation is made, a permissible change in policy whereby temporary relief theretofore extended is withdrawn does not, in my opinion, result in the creation of a new debt.

In the opinion by Mr. Chief Justice Roberts in Lanigan v. Gallup, 17 N. M. 627, 131 P. 997, attention is called to the fact that the phraseology of sections 12 and 13 of article 9 of our state Constitution is practically the

same as that of section 8 of article 11 of the Colorado Constitution; the substance of our two separate sections being there covered into the one section. This similarity in constitutional provisions gives added weight as an authority to the case of Searle v. Town of Haxtun, supra, in which the Colorado Supreme Court declined to recognize the distinction first pointed out in the Joliet Case, again adverted to in the Schnell Case, supra, and finally repudiated by the Ward Case, all decisions of the Supreme Court of Illinois.

I do not doubt the power of the Legislature by Laws 1933, c. 57, to change or modify its policy with reference to disposition of income from public utilities as declared in Laws 1919, c. 47, as amended by Laws 1925, c. 51 (1929 Comp. St. §§ 90-2601 to 90-2603). In Brockenbrough v. Board of Water Com'rs, supra, in meeting a contention similar to that now before us, the Supreme Court of North Carolina said: "The plaintiffs suggest that, as the act of 1899 applied the rents and tolls of the waterworks, the act of 1903 cannot divert them. Certainly the holders of the bonds of 1897 had no lien upon or contract right to these rents. The bonds were issued two years before the act was passed. Therefore the purchasers could not look to ' any other claim upon the city than its general revenues."

I think it will be conceded that, if the 1933 Legislature had repealed outright the 1919 act, thus withdrawing from the taxpayer a partial relief it had theretofore afforded him, and a subsequent legislative session had enacted Laws 1933, c. 57, authorizing issuance of revenue bonds and the pledging of net income of the utility for their security, the taxpayer would have no standing to assert that bonds issued under the later act operated so to increase his tax burden as to constitute the transaction the creation of a debt in the constitutional sense. To my mind, it can make no difference in principle that the modification or repeal, to the extent the former is superseded by the later act, takes place simultaneously with the going into effect of the subsequent enactment. It is just as true in the one case as in the other that no new burden has been imposed upon the taxpayer.

I therefore concur in affirming the decree of the trial court.

BICKLEY, Justice (specially concurring).

While recognizing the strength of the argument for the restrictions placed upon the "special fund doctrine" as advanced by the California Supreme Court in Garrett v. Swanton, 216 Cal. 220, 13 P.(2d) 725, and cases there cited, I am persuaded that the case at bar affords a field for the application of the distinction made in Lang v. City of Cavalier, 59 N. D. 75, 228 N. W. 819, 826, where the city owned a system for the distribution of electrical energy but was without a generating plant, its property was "useless and without value."

Chapter 47, Laws 1919, as amended (chapter 90, art. 26, Comp. St. 1929), commanded that the revenues derived from the operation of any public utility owned and operated by

a municipality, for the purchase or construction of which the municipality shall have issued bonds, to be applied to accomplish two purposes, the first and paramount of which was "(a) to the maintenance of said public utility in good repair, to the improvement and extension thereof and the payment of legitimate expenses of operation," and, secondarily, "(b) to the payment of the interest on the bonds so issued for the purchase or construction of such public utility."

Chapter 57, Laws 1933, authorizes municipalities to issue revenue bonds payable solely out of the unpledged net income of public owned utilities when the governing body of such municipalities declare by ordinance adopted by affirmative vote of two-thirds of the members thereof that it is necessary "for the purpose of making necessary improvements, * * * repairs and betterments of said utility." In the case at bar, the governing body of the town of Springer has declared the necessity for the installation of a new pipe line, rehabilitation filtration plant, and installation of pressure increasing devices. If the distributing system of a waterworks plant gives out, the plant becomes useless and without value. It being the duty of a municipality operating such a utility to supply pure and wholesome water and maintain sufficient pressure for the prevention of disasters by fires, it is readily to be seen that these instrumentalities are necessary to preserve the usefulness and value of the system. Ordinarily I would look with sympathy upon the restrictions to the "special fund" doctrine as developed in Garrett v.

Swanton, particularly in view of our holding in Palmer v. City of Albuquerque, 19 N. M. 285, 142 P. 929, L. R. A. 1915A, 1106. It is to be noted, however, that in Palmer v. City of Albuquerque, the only thing decided was that a city could not mortgage its property. It could be argued with force that the same principle applies to the pledge of income of property owned by the city. In that case, this court cited with approval Joliet v. Alexander, 194 Ill. 457, 62 N. E. 861, 863, and East Moline v. Pope, 224 Ill. 386, 79 N. E. 587. The first of these Illinois cases is constantly cited in the decisions of courts of jurisdictions committed to restrictions on the "special fund" doctrine. Passing over the fact that the holding in Joliet v. Alexander has been somewhat restricted by the Illinois Supreme Court, as pointed out by Mr. Justice Sadler, I note that in the opinion in the Joliet Case the court said: "The ordinance proposes to take the income now derived from it, amounting to about $10,000 a year, and devote it to the payment of the certificates. This is existing property and income of the city derived annually from the present system of water works, independent of the extension, and in no manner resulting from or depending upon it."

The case of repairs and betterments necessary to preserve the plant from destruction or impairment and to enable it to function so as to discharge the purpose of its existence is, in my judgment, different from that of an independent extension.

It is suggested, however, that, since the ordinance authorizing the issuance of the

1916 general obligation bonds provided for the establishment of a "bond fund" derived in part from the operation of the waterworks system out of which the governing body might pay interest on the outstanding 1916 bonds, and the tax levies provided for in said ordinance to pay said interest be proportionately reduced, and since the Legislature in the 1919 act (chapter 47) made it mandatory that such a fund be created and so applied, this amounts to a legislative covenant with the taxpayer for his relief (State ex rel. Roswell v. State Tax Commission, 34 N. M. 304, 280 P. 258), and amounts to a dedication of a portion of the revenues derived from the operation of such utilities to the payment of said interest, and, since chapter 57, Laws 1933, only authorized the pledge of the "unpledged net income of public owned utilities," what is proposed to be done under color of the act has the effect under the definition of net revenue erroneously arrived at by the majority to deplete the "bond fund" established by the 1919 Legislature and to require its replenishment from the levy of taxes or other resources of the town.

I am strongly impressed by the contention, but will not elaborate it because I think the majority is in error in their appraisal of the effect of chapter 57, Laws 1933, upon chapter 47, Laws of 1919. In the opinion, it is said of chapter 47, Laws 1919: "It will continue to be the duty of municipalities to conform to the provisions of 1929 Comp. St. c. 90, art. 26, in the conduct of municipal water works systems, except where they issue bonds under chapter 57, in which event, article 26, supra, must give way to the 1933 Act."

This amounts to saying that net revenue as used in the act of 1933 means the balance of a gross revenue derived from the operation of the utility after deducting "all reasonable expenses of operation." Said chapter 47, Laws 1919, was not expressly repealed by chapter 57, Laws 1933, and, as repeals by implication are not favored, it is our duty to seek reconcilement rather than conflict.

In my opinion, it was not intended by chapter 57, Laws 1933, to disturb the operation of chapter 47, Laws 1919.

The 1933 act authorizes municipalities to pledge the income from the operation of municipally owned public utilities. That the Legislature had the power to do so in 1919 is not questioned. That the Legislature of that year having within a few days after the adoption of chapter 47, Laws of 1919, affirmatively denied to municipalities such power indicated a legislative belief that it had already pledged or devoted or dedicated such revenues for certain specific purposes. If the Legislature may authorize a municipality to pledge revenues derived from operation of a public utility, there seems no reason for saying that it may not dispense with the action of the governing body of such municipalities and do so itself.

Section 2 of chapter 57, Laws 1933, says that the revenue bonds are payable out of net income, and such municipalities are authorized to pledge such revenue to secure the payment thereof. Section 6 of the act does not

say that the gross revenues from the plant, less reasonable expenses of operation, shall be pledged. To be sure, it is mandatory upon the governing bodies of municipalities issuing revenue bonds to establish such rates for service rendered by such utility as will create a net income which shall be sufficient to pay interest coupons on said revenue bonds as they shall mature, and to provide a sinking fund which shall be adequate to discharge said bonds as and when they shall mature, and it shall be their duty to maintain such rates continuously until such bond issue has been fully liquidated. But it is, not there or elsewhere in the act said that rates for such service may not be established which will create revenue sufficient to make further repairs, improvements, and extensions, after the proceeds of the revenue bonds have been all expended, and to create revenue to pay the interest on prior existing bond. issues.

If it be said that construction would admit of the inclusion of repairs, improvements, and extensions within the phrase "all reasonable expenses of operation," it may be said also that there may be found considerable authority that interest is an operating expense, and should also be embraced in said phrase.

What is meant by the authorization of chapter 57, Laws 1933, to issue revenue bonds payable solely out of the "unpledged net income," etc.?

It seems to contemplate pledges of revenues derived from the operation of municipally owned utilities existing prior to its enactment, or that thereafter more than one pledge might be made under the authority of this statute. In either event, it would be necessary to establish such rates as would create revenue sufficient after paying reasonable expenses of operation to discharge bond pledges, and the definition of net income entertained by the majority would not work. The California Supreme Court, in Garrett v. Swanton, supra, referring to a late Missouri case, said:

"A case very similar to the instant case, likewise involving a Fairbanks, Morse & Co. contract, has been recently decided by the Circuit Court of Appeals, Eighth Circuit— City of Campbell, Mo., v. Arkansas-Missouri Power Co.; 55 F.(2d) 560. In that case the action was brought to enjoin the city and Fairbanks, Morse & Co. from carrying out the provisions of a contract for the purchase of certain machinery to be used by the city as a part of its municipal light plant. It appears that at the time the contract was entered into the city, by means of a bond issue approved by the people, already had constructed a distributing system and a power house. The contract with Fairbanks, Morse & Co. was for the purpose of certain machinery for the power plant. The total purchase price of $62,366.40 was to be paid in seventy-two monthly installments, each installment being evidenced by an order providing that said payment was to be made solely out of the light and power fund, and such obligation was not to be a general obligation of the city, 'but is a special obligation payable only

out of the net revenues of the Light & Power Plant.' By the terms of the contract net revenue was defined as the balance of the gross receipts of the power plant after the payment of the legitimate and necessary expenses of the operation of the plant, plus interest on the bond issue, were deducted. It is to be noted that the legal and factual situation presented by the above contract is almost identical with those presented in the instant case. In fact, the contract above outlined presents a situation much stronger in favor of upholding the contract than does the case at bar, for the reason that the specific fund from which the payments were to be made was defined as the fund remaining in the light and power fund after interest on the bonds was deducted, a provision not found in the contract here under consideration. The court held that the contract violated the debt limitation clause in the Missouri Constitution."

Long before the contract referred to in the preceding quotation was entered into, the Missouri Legislature adopted an act almost identical in purpose and very similar in arrangement to our chapter 47, Laws of 1919, making it the duty of municipalities operating waterworks plants to charge rates which—

"shall be sufficient to raise funds adequate:

"I. To pay the current running expenses for maintaining the water works system, and provide for such extensions and renewals as same may become necessary.

"II. To provide for the payment of the interest on the bonded indebtedness.

"III. To provide (sinking fund)."

See R. S. of Missouri 1919, § 9113 (Mo. St. Ann. § 7675).

Of course, I place no greater reliance upon this circumstance than that with a statute similar to our chapter 47 of Laws of 1919 before them, the parties, including Fairbanks, Morse & Co., whom the books disclose have had vast experience in drafting similar of interest on outstanding bonds out of revenue derived from operation of the utility be- contracts, so as to avoid running counter to limitations upon the debt contracting powers of municipalities, deemed it just and wise, and perhaps safer, to provide for a payment fore making application of such revenue to the payment of the more recent issue of revenue bonds on pledge orders. Chapter 57, Laws 1933, contains authority broad enough to apply to a number of varied situations. Revenue bonds under it might be issued by a municipality operating a public owned utility, which was not in debt, in which event the present question would not arise. Chapter 47, Laws of 1919, was not designed as a legislative direction to all municipalities owning and operating a public utility, but was designed to direct and control only such municipalities so operating public owned utilities "for the purchase or construction of which the municipality shall have issued bonds." In the case of such municipality as had not issued bonds for the purchase or con-

struction of its public utility, no restraint would be upon it if it desired to avail itself of the provisions of chapter 57, Laws of 1933, so far as the statute is concerned. Since only "sufficient" of the net income is pledged as will pay the interest and the principal of the revenue bonds, I am not sure that we need a definition of "net revenue," but, if one is required, I think, in view of the 1919 and 1933 legislation under the facts in this case, a proper definition of net revenue would be, in effect: "The balance of the gross receipts of the municipality's water works plant after the payment of all reasonable expenses of operation, including interest on outstanding bonds issued for the purchase or construction of the public utility."

Substantially such a definition and application of the statutes would eliminate the objection that the transaction as a whole would result in the resources of the town becoming depleted by the requirements of the proposed new issue of revenue bonds, and consequently require replenishment from taxes or other revenues of the town. Because I think this is a reasonable construction of the 1919 and 1933 acts, as applied to the situation in the case at bar, I concur in affirmance of the judgment.