120 P.2d 434

STATE OFFICE BLDG. COMMISSION v. TRUJILLO, State Auditor.
No. 4641.

Supreme Court of New Mexico.

Oct. 17, 1941.

Rehearing Denied Jan. 12, 1942.

C. C. McCulloh, of Santa Fe, Fred J. Federici, of Raton, and O. O. Askren, of Roswell, for appellant.

E. P. Chase, Atty. Gen., George H. Hunker, Jr., and A. M. Fernandez, Asst. Attys. Gen., C. R. McIntosh and Reed Holloman, both of Sante Fe, and Mechem & Hannett, of Albuquerque, for appellee.

FRENGER, District Judge.

The appellee, State Office Building Commission of the State of New Mexico, created by Chapter 62 of the New Mexico Session Laws of 1941, filed its petition in the lower court. The appellant, E. D. Trujillo, State Auditor of the State of New Mexico, duly answered thereto. The appellee having demurred to the answer, and having been sustained, this case comes before us on appeal from the order and judgment of the lower court in sustaining the demurrer.

Said Chapter 62 of the Laws of 1941 was approved April 14, 1941, and is entitled: "An Act Authorizing and Providing for the Construction and Equipment of a State Office Building," etc.

Invoking our declaratory judgment law, both parties by their pleadings seek to have their respective rights declared and established.

Acting under the provisions of said Act, appellee has entered into a lease agreement with the State Board of Barber Examiners of the State of New Mexico, as follows:

"Whereas the State Office Building Commission, duly created by Chapter 62, Session Laws of 1941, is authorized and empowered to construct and equip a State Office Building at Santa Fe, New Mexico, and acquire a site therefor so as to thereby provide suitable and adequate quarters for various state departments and agencies, and responsive thereto said Commission has caused to be prepared preliminary plans and specifications of such building; and

"Whereas the State Board of Barber Examiners of the State of New Mexico has proposed to and agreed with said State Office Building Commission that it will use and occupy a portion of said building when constructed and equipped and that it will pay for such use and occupancy upon the terms and conditions as hereinafter set forth;

"Now, Therefore, It is hereby agreed by and between the State Office Building Commission of New Mexico, and the State Board of Barber Examiners of New Mexico, as follows:

"1. That said State Office Building Commission agrees to construct and equip the State Office Building as contemplated by the preliminary plans and specifications, which plans and specifications are now on file with said Commission, and that it will thereafter maintain, operate and keep said building in repair, and said State Board of Barber Examiners hereby agrees, upon completion of said building to use and occupy the same to the extent of 271 square feet of floor space, together with the right of use of the auditorium to be constructed therein, and together with all other facilities in the building, and to pay for such use and occupancy an annual rental of $300.00 in quarterly installments on February 1, May 1, August 1, and November 1 of each year, such payments of rental as aforesaid to be made from any funds available to the State Board of Barber Examiners for that purpose, and to be paid into the Treasury of the State of New Mexico as provided and required by said Chapter 62 of the Session Laws of 1941.

"2. It is hereby agreed that the period of use and occupancy as aforesaid shall terminate twenty-five years from the date of this agreement unless extended; provided, that payments shall not commence until the building shall have been completed and made available for such use and occupancy, and provided further that

said State Board of Barber Examiners may terminate this agreement and shall not be required to continue to use and occupy said building and make payments as aforesaid whenever and after it is shown that the terms and conditions of such use and occupancy, and the amount required to be paid therefor is unjust and unreasonable considering the value of such use and occupancy, and it is further shown that equally desirable facilities are available in privately owned buildings upon more advantageous terms. Such termination of this agreement may be accomplished only if notice thereof in writing is given the State Office Building Commission at least sixty days prior to the termination date and all sums to be paid for use and occupancy as of the date of termination shall have been paid in full."

It is set out in the pleadings that by a communication directed to appellant, the appellee has made inquiries as follows: " * * * whether he (appellant) would at the proper time issue warrants for the rental provided in said lease agreement and other similar lease agreements proposed to be entered into from time to time hereafter, under the provisions of said act, and whether he would issue warrants for disbursements out of the State Office Building Fund when proper vouchers are presented in compliance with the terms of said Chapter 62 of the Laws of 1941."; and that in response to such inquiries, the appellant has declared his intention: " * * * to refuse approval of any vouchers and the issuance of any warrants in payment thereof for rentals under said lease agreement, and other like lease agreements which may be entered into from time to time in the future, and has declared his intention to refuse the approval of vouchers and the issuance of warrants in payment thereof for disbursements out of the State Office Building Fund provided by Chapter 62 of the Laws of 1941;".

By way of justifying his intended refusals, appellant sets out in his answer as follows, among other things:

"I. That (1) the act contemplates and petitioner proposes to enter into contracts with other state departments and agencies for the use of office space in said building and for rentals to be paid by the state through such agencies from funds derived from ad valorem taxes, excise taxes, and other taxes or income received by the state for or through said agencies, from which rentals said State Office Building Debentures are to be paid; and petitioner is not authorized to lease or rent to anyone except a state agency or department; (2) the act contemplates and petitioner proposes to require through such contracts payment 'for such use and occupancy such respective amounts that the aggregate thereof each year will be sufficient to pay the actual and necessary expenses not otherwise provided for operation, maintenance, repair and upkeep of such building, the actual principal and interest requirements of the debentures as

such principal and interest become due', and to build a certain reserve fund for safety; (3) such sums will be approximately One Hundred Thousand Dollars per year; (4) said act prohibits any future Legislature from diminishing or impairing the powers, duties or existence of said commission in any manner which will affect adversely the interests and rights of the holders of said debentures; (5) and the obligation represented by said debentures has not been and will not be in any manner submitted to the vote of the qualified electors of the state.

"II. By reason of the facts hereinabove, it follows as a matter of law that such so-called rentals will be the sole source of payment and will constitute payments of moneys of the state derived from ad valorem taxes or from state funds which will necessarily have to be replaced by moneys so derived, that no future Legislature can refuse to appropriate public funds, for the payment of such so-called rentals without thereby impairing the obligations of said bond contract and rental contracts in contravention of Section 19, Article II of the New Mexico Constitution, that if so, the full faith and credit of the state is pledged directly or indirectly for the payment thereof, that the issuance of said debentures will therefore constitute a debt within the meaning and in violation of Sections 7 and 8 of Article IX of the State Constitution.

"III. In addition to the facts above stated in Paragraph I hereof, the act provides that the title to said proposed state office building is to be presently and immediately vested in the State of New Mexico, and that thereafter, as a matter of law, the rentals provided by said contracts do not constitute rent, but installment payments out of funds derived partly from ad valorem taxes for a presently owned capitol building, and the obligation to pay the same constitutes a debt created in violation of said Section 7 and 8 of the State Constitution.

"IV. Said act authorizes and petitioner has entered into a contract with the Board of Barber Examiners for a specified rental to be paid during a period of twenty-five years, and said petitioner proposes to enter into similar contracts for office space with other state agencies and departments, and that such contracts constitute obligations for payment of money by the state through said state agencies, which obligations may not be impaired by any action of the State Legislature or the people, and that a vote of the people thereon has not been obtained, and that therefore, as a matter of law, each of said obligations constitute a debt within the meaning and in violation of Sections 7 and 8 of the State Constitution.

"V. That Section 8 of said Chapter 62 of the Laws of 1941 provides that such debentures shall be 'payable solely and only from the income and revenues of the State Office Building', and Section 9 thereof provides that the state departments and agencies contracting with said commis-

sion for the use and occupancy 'shall pay the sums of money so agreed upon as rentals into the Treasury of the State of New Mexico', and that 'said moneys shall be placed by the State Treasurer to the credit of the State Office Building Fund', and further provides that the charges so made shall be sufficient to pay such debentures and interest as they become due, and necessary expenses not otherwise provided of operation, maintenance, repair and upkeep of such building, and that no provision for the payment of such moneys by the state is otherwise made, and that therefore as a matter of law no appropriation of said moneys for payment in accordance with the provision of Section 30 of Article IV has been made, and defendant would be without right to approve vouchers and issue warrants therefor."

To aid in understanding the questions involved as above presented, we set out such parts of said Chapter 62 of the Laws of 1941 as are deemed material to this discussion:

"Section 1. That for the purpose of providing suitable and adequate quarters for various state departments and agencies and relieving the present congestion and lack of suitable and adequate quarters and offices for such departments and agencies, and also in order to restore to the Legislature of the State of New Mexico the quarters belonging to and required by that branch of the government, the construction and equipment of a state office building at Santa Fe, New Mexico, and the acquisition of a site therefor are hereby authorized in the manner provided by this Act.

"Section 2. That there is hereby appropriated out of the fund in the state treasury, to be known as State Office Building Fund, the sum of $1,000,000, or so much thereof as may be necessary for the purposes specified in Section 1 hereof.

"Section 3. That for the purpose of carrying out the provisions of this Act there is hereby created a public body corporate as an agency of the State, to be known and designated as the State Office Building Commission, which shall consist of the Governor of the State, the Lieutenant Governor of the State, the Commissioner of Public Lands, the Commissioner of the Bureau of Revenue and the Chairman of the State Highway Commission. * * *

"Section 4. Said Commission shall have full power and authority to do any and all acts necessary and proper in and about the construction and equipment of such state office building, including employment of an architect, the acquisition of a site for such state office building, if deemed necessary, adequate equipment of such state office building, and the Commission may enter into a contract or contracts for the construction of such building. * * * All expenditures in connection with the construction and equipment of such building and acquisition of a site therefor shall be paid solely and only from the State Office

Building Fund, which shall consist of proceeds of the debentures as herein provided to be issued. Said Commission may construct said building upon the capitol grounds or other gounds belonging to the State or in the discretion of the Commission, the site for such building may be acquired by donation, purchase, or by the exercise of the power of eminent domain in the manner provided by law for acquiring property for public use, and the title to any such site thus acquired shall be vested in the State of New Mexico.

"Section 5. For the purpose of providing funds to carry out immediately the provisions of this act with respect to the construction and equipment of such building, and the acquisition of a site therefor if deemed necessary, the Commission is hereby authorized, pursuant to resolution, to issue and sell at the par value thereof in such manner and form and under such conditions and by such methods as the Commission shall deem best, not exceeding $1,000,000.00 principal amount of its State Office Building Debentures bearing interest at the rate of four per cent (4%) per annum; maturing serially within not more than twenty-five years from their date in such installments commencing not more than five years from their date that the annual amounts needed for both principal and interest during such maturity schedule will be substantially equal. It may be provided in any of such debentures that same are redeemable prior to maturity at times and upon terms as therein specified. Such debentures shall be signed by the Chairman of the Commission, attested by its Secretary, with the seal of the Commission thereunto affixed, and shall be countersigned by the Treasurer of the State of New Mexico, and shall have interest coupons attached bearing the facsimile signature of the treasurer for semiannual interest payments. Such debentures and the interest coupons thereto attached, when issued, shall have all of the qualities of negotiable instruments under the law merchant, and shall be incontestable in the hands of bona fide purchasers or holders thereof for value, and such debentures and the interest thereon shall be exempt from all taxation except estate, inheritance or gift taxes now or hereafter imposed by law.

"Said Commission is hereby authorized pursuant to resolution to issue its State Office Building Refunding Debentures for the purpose of refunding any State Office Building Debentures issued hereunder and then outstanding, and the provisions of this act shall apply to the issuance of such State Office Building Refunding Debentures in so far as pertinent.

"Section 6. In the discretion of the Commission such State Office Building Debentures may be secured by a trust indenture by and between the Commission and a corporate trustee, which may be any trust company or banking institution having the powers of a trust company within or outside the State of New Mexico. Either the resolution providing for the issuance of debentures or such trust indenture may

contain such provisions for protecting and enforcing the rights and remedies of the holders of such debentures as may be deemed by the Commission to be reasonable and proper, including covenants in relation to the acquisition of the building, the construction thereof, its maintenance, operation, repair and insurance, and the custody, safeguarding and application of the proceeds of such debentures and of the income received by the Commission for the use and occupancy of such building.

\*    \*    \*    \*    \*    \*

"Section 8. That such debentures shall constitute only the corporate obligation of said Commission, payable solely and only from the income and revenues of the State Office Building constructed and equipped from the proceeds thereof, and it shall be plainly stated on the face of each of such debentures that same does not constitute an indebtedness of the State of New Mexico within the meaning of any constitutional provision or limitation, but that it is payable solely and only as to both principal and interest from revenues of the State Office Building. The proceeds of the sale of such debentures shall be received and receipted for by the Treasurer of the State of New Mexico, and shall be by him placed to the credit of the State Office Building Fund, except such amount as shall be ordered by the Commission set aside to pay interest on such debentures during the construction period of the building. Such proceeds shall be disbursed on warrants drawn by the State Auditor, supported by voucher of the Commission.

"Section 9. That when any such debentures shall have been issued the Commission shall proceed with the construction and equipment of the building as promptly as may be, and from and after the date of completion of such building it shall be available for use and occupancy by various state departments and agencies, and particularly the following:

"The Commissioner of Revenue; [and then 26 other agencies or sub-agencies or state activities, including the State Board of Barber Examiners, are set out]; and any other agency or department of the State which the Legislature may hereafter provide by law to perform any or all of the duties or functions now being performed by any or all of the foregoing, together with any other state departments or agencies of the State which may contract with the Commission for space in said state office building.

"Said Commission and the various state departments and agencies proposing to use and occupy the building shall enter into appropriate agreements setting forth the terms and conditions of such use and occupancy, and the said departments and agencies shall pay the sums of money so agreed upon as rentals into the Treasury of the State of New Mexico and said moneys shall be placed by the State Treasurer to the credit of the State Office Building Fund, and the Commission shall be re-

quired to charge for such use and occupancy such respective amounts that the aggregate thereof each year will be sufficient to pay (1) the actual and necessary expenses not otherwise provided of operation, maintenance, repair and upkeep of such building; (2) the actual principal and interest requirements of the debentures as such principal and interest become due; and (3) a margin for safety as of reserve for such principal and interest which shall be equal to twenty per cent (20%) of the actual amounts required by items (1) and (2).

\* \* \* \* \* \*

"Any State department or agency using and occupying any part of said building shall not be obligated to continue such use and occupancy and make payments therefor pursuant to any such agreement, but shall be entitled to vacate the building provided it is shown that the terms and conditions of such use and occupancy and the amount required to be paid therefor is unjust and unreasonable, considering the value of such use and occupancy, and that equally desirable facilities are available in privately owned buildings upon more advantageous terms. All funds received by the State Treasurer for use and occupancy of such building shall be used solely and only for the purpose aforesaid, and the portion thereof available for principal and interest, including the reserve therefor, as collected and received, shall be remitted by the State Treasurer to the place of payment of such principal and interest. Any

holder of any of the debentures issued pursuant to the provisions of this act, or any person or officer being a party in interest may either at law or in equity, by suit, action, or mandamus, enforce and compel performance of the duties imposed or required or provided by this act.

"Section 10. It shall be the duty of the Commission to suitably provide for the preservation, repair, care, cleaning, heating and lighting of such building, and to provide and enforce all rules and regulations with respect thereto. Said Commission is authorized to avail itself of any facilities and services in connection with the maintenance and operation of the building by agreement with the committee, officer, or employee, as may be designated by law to supervise the care, custody and operation of other state owned capitol buildings. The Commission shall meet at least monthly in the office of the Governor and examine, audit and allow and record all existing claims due and owing for expenses of operation including light, heat and water; maintenance, upkeep and repair of the building not otherwise paid or discharged, it being contemplated, however, that such ordinary expenses may be otherwise provided by law in the same manner as similar expenses for other state owned buildings.

"Section 11. While any of the debentures issued by the Commission pursuant to this act remain outstanding, the powers, duties or existence of said Commission shall not be diminished or impaired in any

manner that will affect adversely the interests and rights of the holders of such debentures, * * *. The provisions of this act shall be for the benefit of the State, the Commission, and the holders of such debentures."

It is manifest from the title and from Section 1 and from a general purview of the Act, that its basic purpose is to acquire an office building for, and for the benefit of, the State of New Mexico. The purpose being clear, what is further set out in the Act is matter of detail supplemental to the main purpose.

The Act sets out a plan of financing whereby such basic purpose may be accomplished. Looking to the arranging for finances and only for such purpose, the appellee Commission, consisting of certain state officers, is given the status of a corporate entity.

To act at all in such matters, the State can do so only through an agency or agencies. Section 3 expressly designates the Commission as the agency of the State. It is through such agency that the State is to act, and being an agency, its acts are the acts of the State. If the acts proposed to be done in financing the enterprise are valid, then such acts do not require conferring the status of a corporation upon the agency, though it might be of practical convenience and value to do so, as was illustrated in our case of State v. Connelly, 39 N.M. 312, 46 P.2d 1097, 100 A.L.R. 878. Though successfully surmounted for the purpose of deciding that

case, the question was presented whether the Capitol Addition Commission was a proper party relator under mandamus action therein sought. We had under consideration Ch. 14, Special Session Laws of 1934, being also an act for construction of a state building, and wherein a Commission was created for purpose of financing but which was not created a corporation.

Regarding the appellee as an agent of the State and that the acts to be done and performed by it are the acts of the State, the vital question presented is whether the issue of debentures contemplated by the Act in question would create a State debt or debts within the meaning of Section 8 of Article IX of our State Constitution. If such a debt would result, then the Act in authorizing such indentures must be held to be invalid for want of compliance with the requisites of said section, especially in that it did not provide for submission to the qualified electors of the State; and under the admitted facts of this case no such submission is intended. If such a debt would not result, absent other constitutional objections, the Act is valid and the issuance of the debentures would be lawful.

Said Section 8, and preceding Section 7 of Article IX of our Constitution, are as follows:

"Sec. 7. The state may borrow money not exceeding the sum of two hundred thousand dollars in the aggregate to meet casual deficits or failure in revenue, or for necessary expenses. The state may also

contract debts to suppress insurrection and to provide for the public defense.

"Sec. 8. No debt other than those specified in the preceding section shall be contracted by or on behalf of this state, unless authorized by law for some specified work or object; which law shall provide for an annual tax levy sufficient to pay the interest and to provide a sinking fund to pay the principal of such debt within fifty years from the time of the contracting thereof. No such law shall take effect until it shall have been submitted to the qualified electors of the state and have received a majority of all the votes cast thereon at a general election; * * *. No debt shall be so created if the total indebtedness of the state, exclusive of the debts of the territory, and the several counties thereof, assumed by the state, would thereby be made to exceed one per centum of the assessed valuation of all the property subject to taxation in the state as shown by the preceding general assessment."

Under the decisions of our court we have adopted or acceded to what is termed the special fund theory or doctrine.

In the case of State v. Regents of University of New Mexico, 32 N.M. 428, 258 P. 571, 572, acting under legislative sanction, the Regents proposed to issue bonds in the sum of $190,000 to erect buildings and for improvements. In response to an objection raised to the validity of so issuing the bonds, we said:

"1. The Attorney General argues that the proposed bonds are in effect the obligation of the state, and as such may be issued only in compliance with the provisions of section 8 of article 9 of the Constitution, which requires that any law authorizing any such debt shall provide for an annual tax levy sufficient to pay interest and provide a sinking fund, and each law shall be submitted to a vote of the people for approval, neither of which requirements have been complied with. The argument is unsound and based upon a false premise. It is true that the state holds the legal title to the lands granted by Congress, but there is nothing in the enabling act or the state Constitution preventing the state from making the state University and other state institutions the beneficiary of these grants, and empowering them to make such use of the proceeds or income therefrom as it may be deemed proper, within the limits prescribed by the congressional legislation. In the case of the University, by section 11 of article 12 of the Constitution it was made owner of the state educational institutions, and by section 12 of the same article the lands granted or confirmed by the enabling act for University purposes were accepted and confirmed to it for such purposes. We have then a case where a grant of lands has been made to the state as trustee, for the use and benefit of the University as beneficiary, the income whereof may be used by the University in such manner as the state may by law provide, subject always to the restrictions of the congressional legislation, if any there are. In this case, however, there are no restrictions imposed. The Legislature

therefore had power to authorize the University to make such use of its income as was deemed best. This is all that is contemplated by chapter 47, Laws 1927, and all that is proposed by the University. It proposes to contract with its bondholders that it will appropriate *out of its income* sufficient sums of money to pay interest and provide a sinking fund for the retirement of the bonds. It does not propose to mortgage its property in specie. It simply agrees to pay out of its income. How it can be said that this will be an obligation of the state, we cannot understand. This is simply a contract of the University to pay out of *a designated fund when received.* It is no more an obligation of the state than would be the obligation to pay the salaries of the University faculty. The mere fact that the University is the creature of the state and one of its instrumentalities to carry out its governmental functions is not controlling. The state has given the University certain property rights and has authorized it to make use of the same in a certain manner. This the University is proposing to do, and we can see no objection to the same." (Italics ours.)

In the case of Seward v. Bowers, Mayor, et al., 37 N.M. 385, 24 P.2d 253, it was sought to enjoin the appellees, Bowers, Mayor, et al., from making, executing and delivering to the Reconstruction Finance Corporation, $37,500 in revenue bonds for a loan of an equal amount, the bonds to be paid *exclusively from net revenues,* to be derived by the municipality from the operation of its municipally owned waterworks system. In refusing injunction, the opinion of Mr. Justice Zinn quotes with approval from 19 R.C.L. § 281, page 985. What is there set forth refers to municipalities. To the same effect as applied to states, we quote from 59 C.J. 225 and 226, to-wit:

"Obligations, issued by a state, if payable only from the revenue to be realized from a particular utility or property, acquired with the proceeds of the obligations, if payable only from the revenue to be realized from special taxes for a particular utility or property, acquired by the obligations or proceeds, * * * do not generally constitute debts of the state within the meaning of constitutional limitations on indebtedness; * * *".

From the opinion, Seward v. Bowers, Mayor, et al., supra, we quote as follows:

"Keeping in mind the rule that there is no 'indebtedness' in the constitutional sense unless there is either a legal, equitable, or moral obligation on the part of the town of Springer to pay the bondholders of the proposed issue out of other moneys than the net revenue from the improved waterworks system, we find that section 5 of the act under which it is proposed to issue the bonds is as follows: 'It is hereby declared that revenue bonds, issued under the provisions of this Act, shall not be considered or held to be general obligations of the municipalities issuing them, shall be collectible only out of the net revenues derived from the operation of the utility

whose income is so pledged, and each of the bonds of any issue of revenue bonds so issued under the provisions of this Act shall recite on its face that it is payable and collectible solely from the revenues derived from the operations of the utility, the income of which is so pledged, and that the holders thereof *may not look to any general or other* fund for the payment of principal and interest of such obligation.'

"This section of the legislative act makes it clear that the proposed bonds are not to be considered or held to be general obligations of the municipality, *are collectible only out of the net revenues derived from the operation of the utility whose income is pledged for that purpose;* the bonds on their face are to recite that the principal and interest are payable and collectible solely from the revenues derived from the operation of the utility, and such recital is notice to the holder that he may not look for his recompense to any general or other fund for the payment of principal or interest. The city incurs no liability payable out of its tax or other revenues on account of the issuance of the revenue bonds, and the act *negatives* any such liability." (Italics ours.)

The case of State ex rel. Capitol Addition Building Commission v. Connelly, 39 N.M. 312, 46 P.2d 1097, 1100, 100 A.L.R. 878, which case has already been referred to, and which we shall refer to as the Connelly case, is relied on very strongly by both of the parties to this cause to sustain their respective contentions. Under Chapter 14, Special Session Laws of 1934, being an Act entitled "An Act Authorizing the Construction of an Addition to the Capitol Building", etc., a Commission was created and given authority to issue debentures up to $175,000 in order to provide funds to carry out the purposes contemplated by the Act. For the purpose of meeting such payments under such debentures, the Act provided that:

"There is hereby levied a fee of $2.50 upon each and every civil action filed in the office of the clerk of the various district courts of the state of New Mexico, which said fee shall be paid to the clerk at the time of the filing of such action, by the party so filing the same, and which fee shall be in addition to the docketing fee now imposed by § 34-343 of the New Mexico Statutes Annotated, Compilation of 1929, and which fee so collected shall be kept by said clerk in a separate fund and remitted to the state treasurer on the first day of every month, for the purpose of paying the principal and interest on the debentures herein authorized to be issued and sold." Section 4.

And it further provided:

"The issue and sale of said debentures shall constitute an irrevocable and irrepealable contract between the state of New Mexico and the owner of any of said debentures, that the taxes and/or fees pledged for payment thereof, at the rate now provided by this law shall not be reduced so long as any of said debentures remain outstanding and unpaid, and that the state will

cause said taxes and/or fees to be promptly collected and set aside and applied to pay said debentures and interest according to the terms thereof." Section 12.

In the above case we held that the Act did not offend as to Section 8 of Article IX of our State Constitution. The situation disclosed under said case differs in one respect from that under the case of State v. Regents of University of New Mexico, supra, in that under the last named case the undertaking was held not to be that of the State, whereas in the Connelly case it is clearly and directly that of the State. There is also a difference as to the situation under the case of Seward v. Bowers, supra, from that under the Connelly case. Under the former, the bonds were to be paid from income derived from what was to be purchased, whereas under the latter, the payment of the debentures was not to come out of anything to be purchased. The source of payment under the Connelly case, to-wit, by means of imposing additional court docket fees, was termed a sort of excise tax under the decision. In upholding the constitutionality of the Act referred to in the Connelly case, Mr. Chief Justice Sadler had this to say:

"Speaking of the term 'debt' as used in article 9, § 12, of the State Constitution, in Seward v. Bowers [37 N.M. 385, 24 P.2d 253], we said: 'The idea of a "debt" in the constitutional sense is that an obligation has arisen out of contract, express or implied, which entitles the creditor unconditionally to receive from the debtor a sum of money, which the debtor is under a legal, equitable, or moral duty to pay without regard to any future contingency.'

"As applied to the constitutional provision interpreted in Seward v. Bowers [supra], we disclosed our adherence to the 'special fund' doctrine, and the general faith and credit of the municipality not having been pledged to retire the bonds, nor held subject to be invoked under 'any future contingency' in aid of their retirement, sustained the proposed bond issue against the constitutional attack made upon it.

"We reach the same conclusion in the case before us. While it is true that in Seward v. Bowers [supra] we were concerned with the intended meaning of the word 'debt' as found in article 9, § 12, while here it is its meaning as employed in section 8 of the same article, we are convinced that the term is used in the same sense in each section, viz., as comprehending a debt pledging for its repayment the general faith and credit of the state or municipality, as the case may be, and contemplating the levy of a general property tax as the source of funds with which to retire the same.

"This conclusion is strongly reflected in the language itself of this and companion sections of article 9. Even without the aid of such strong intimation in the language employed, it is generally held under kindred provisions of other State Constitutions, as we shall hereinafter show, that the debt whose contracting is inhibited is

one which *may* engage the general taxing power of the state or municipality for its repayment." (Italics ours.)

And it is further set out in the opinion of Mr. Chief Justice Sadler:

"Now, either the debentures here assailed are to be condemned because not repayable from the proceeds of a property tax levy, or they are not within the interdiction of article 9, § 8, because not the kind of debt therein contemplated. One or the other conclusion seems inescapable. The framers of the Constitution were not unacquainted with excise taxation as a source of revenue, as witness the language of article 8, § 2, as originally adopted. They thus either purposely denied to the state, through its Legislature, the power to employ same as a basis of credit to any extent whatsoever, and deliberately imposed the whole burden of repaying such indebtedness as lawfully might be created upon property taxpayers; or they left the Legislature in possession of its plenary powers touching the subject.

"It is not unusual to find words employed in a Constitution in a less comprehensive sense than they are capable of bearing. 'Taxes' is surely a term broad enough to cover excise as well as property taxes. And yet we have held in accordance with the courts of other states that the word 'taxes,' as used in the constitutional guaranty of equality and uniformity, does not apply to excise taxes. State v. Mirabal, 33 N.M. 553, 273 P. 928. Construing together these companion sections of article 9, in order to arrive at the true meaning and intent of the framers of the Constitution (Gutierrez v. Middle Rio Grande Conservancy District, 34 N.M. 346, 282 P. 1, 70 A.L.R. 1261), we hold the debt contemplated in section 8 thereof is one secured by a property tax, and not an excise tax.

"And so we conclude that the debentures in question, *neither requiring nor warranting a resort to the general taxing power* of the state for their retirement, but payable *instead* from proceeds of an imposition in the *nature of an excise* laid upon all civil actions filed with the various district clerks of the state, in addition to the regular docket fee, to be converged into a special fund in the hands of the state treasurer, will not constitute a general obligation on the part of the state. Hence, they are not within the interdiction of article 9, § 8, of the State Constitution." (Italics ours.)

And said opinion further sets forth: "A careful reading of the act authorizing the debentures here questioned leaves no doubt that the same are payable *solely and only* from the proceeds of the special fund provided for in said act. The failure to provide an annual tax levy and order a referendum is suggestive, although not controlling, that in legislative contemplation the debentures have no claim upon a property tax levy for their retirement. But the imposition of the fee on civil actions, with a direction that the same shall be set up in a special fund for the express purpose of satisfying the principal and in-

terest of these debentures, with the added mandate in section 12 of the act—that the issue and sale of said debentures shall constitute an irrevocable and irrepealable contract between the state and the owner of any of said debentures that the fees pledged for the payment thereof at the rate now provided by said law 'shall not be reduced so long as any of said debentures remain outstanding and unpaid, and that the state will cause said taxes and/or fees to be promptly collected and set aside and applied to pay said debentures and interest according to the terms thereof'—abundantly repels the inference that *any source of revenue whatsoever, other than that specially created in the act, might be resorted to* by the holders of said debentures as security for the payment thereof." (Italics ours.)

In the case of City of Santa Fe v. First National Bank, 41 N.M. 130, 65 P.2d 857, the facts show that the City of Santa Fe, for the purpose of paying the cost of constructing sewer improvements under statutory authority, uttered sewer certificates. By the terms of said certificates they were payable from money received from special assessments levied to pay for said sewer improvements, and in addition thereto, under said certificates, the city promised and agreed that any deficiency in the fund to pay said certificates or the interest thereon should be paid from general revenues of the city. The obligations represented by such certificates were never submitted for approval by the qualified voters of the city as provided for by Sec. 12 of Art. 9 of the State Constitution. We held that such parts of the certificates whereby the city promised to pay any deficiency in the sewer fund from the general revenues of the city were invalid. In distinguishing a debt under the special fund doctrine from a debt in the constitutional sense, we quoted with approval the following language from the case of Brash v. State Tuberculosis Board, 124 Fla. 652, 169 So. 218, 219:

"*Only* where it can be clearly *demonstrated* beyond a reasonable doubt that a contemplated scheme of embarkation upon new capital ventures will *not immediately or mediately, presently or in futuro, directly or contingently,* operate to impose an added burden on the taxing power, or have the effect of impairing the public credit in futuro, will the consummation of such a debt incurring scheme be held authorized, absent the approving voice of the freeholders, as required by amended section 6 of article 9 of the Constitution, in the case of municipal, county, and district enterprises. And, in the case of enterprises authorized by the Legislature to be embarked upon through state agencies, a particular scheme of financing will be held to be valid only where it is clearly demonstrable from the *specific terms* of the *financing proposal itself* that no tax burden or pecuniary liability of the state to appropriate or pay for the indebtedness about to be incurred will ever arise, or be looked to as security, in whole or in part, for repayment of the borrowed moneys." (Italics ours.)

Under facts similar to the above case of City of Santa Fe v. First National Bank, its decision was followed in the case of Henning v. Town of Hot Springs, 44 N.M. 321, 102 P.2d 25.

The obligations referred to under the cases of State v. Regents of University of New Mexico, Seward v. Bowers, and State v. Connelly, supra, were held to come within the special fund theory; whereas those for determination in the cases of City of Santa Fe v. First National Bank and Henning v. Town of Hot Springs, supra, were adjudged not to be within the doctrine.

We have thus dwelt upon our decisions to show that so far as we have adhered to the special fund doctrine, it may be said for the purpose of this discussion that it means that thereby and thereunder any financial obligation of the state, not otherwise constitutionally objectionable, is valid without approval of the electorate if it is to be paid for and discharged in full from moneys derived from sources other than from general taxation, as contemplated under Section 8 of Article IX of the State Constitution; and to show that for such an obligation to come under the special fund doctrine, the creation of the obligation and the law authorizing it must specify and set out the sources for payment thereof and thereby disclose that no part of the payment is to be obtained from general taxation.

It is contended by appellee that the Connelly case is decisive of the instant case. Appellee seems to regard the moneys when obtained through the lease contracts with the State Board of Barber Examiners, and through other proposed similar lease contracts with other state agencies, as the source for payment of the debentures, and that thereby a special fund has been set up. Indeed, a careful reading of the Act discloses that such was *the* plan contemplated for financing the enterprise. It is provided under Section 8 "that such debentures shall constitute only the corporate obligation of said commission, payable *solely and only* from the *income and revenues* of the State Office Building constructed and equipped from the proceeds thereof, and it shall be plainly stated on the face of each of such debentures that same does not constitute an indebtedness of the State of New Mexico *within the meaning* of any constitutional provision or limitation, but that it is payable *solely* and *only* as to both principal and interest from *revenues* of the State Office Building". After specifying that the moneys for purpose of the proposed rental contracts shall be paid by the various agencies to the State Treasurer, to be by him placed to the credit of the State Office Building Fund, it is set out in Section 9 that: "All funds received by the State Treasurer. * * * shall be used *solely and only* for the purpose aforesaid, and the portion thereof available *for principal and interest,* including the reserve therefor, as collected and received, shall be remitted by the State Treasurer to the place of payment of such principal and interest." The Connelly case cannot be decisive of instant case because

there is an essential difference. Under the Connelly case the moneys to make up the special fund come from the public at large or that part of the public that engages in litigation in the district courts, whereas under the plan now being considered the moneys to make up the assumed special fund would be supplied by the State. It was *because* moneys to pay off the indentures were to be derived from a sort of excise tax, that the financial obligation contemplated in the Connelly case was upheld. Apparently within the plan in question, it was regarded that the completed structure would be similar to a public utility, the revenues from which arise from its operation. Such an idea is entirely erroneous. The proposed State Office Building is not to be constructed to serve the public or such part thereof as may desire to avail itself of the facilities of the building. It is not proposed to rent office space of the building to the public or to use the building in any manner whereby revenue or income may come in from the outside. It is not designed that the building shall be revenue producing in itself, but the sole purpose of the state in procuring the building is to "House Departments and Agencies of the State of New Mexico" as is set out in the title of the Act. Considering our former decisions in expounding the special fund doctrine, we cannot uphold the Act as setting up a special fund by the means contemplated as above set out within the proper acceptation of the term.

If we go back of the rentals to be paid by the State Board of Barber Examiners and other agencies to seek out where the moneys are to be obtained by the agencies for the purpose of paying such rentals and thereby to determine if the moneys to be so obtained may constitute a special fund or funds for the purpose of paying off and discharging the debentures, then there is this further difference between the Connelly and the present cases: Under the Connelly case it was specifically required that the moneys to be raised for payment of the debentures referred to therein were to be obtained from excise tax *and in no other way,* whereas in the instant case nothing whatever is said as to how the funds are to be raised to supply the agencies with money to pay the rentals. It is not specified in the Act that such moneys to be raised for payment of rentals *shall* come out of excise taxes or from any source aside or apart from general taxation. It is suggested in argument that the various agencies named in the Act, or some of them, will or do obtain moneys from excise taxes, fees, etc., out of which they could pay the rentals; but the Act does not *direct or require* that such rentals shall be paid from such sources. As we have pointed out, before a special fund scheme may prevail it is necessary that the sources for payment of the financial obligation be set out in the *creation* of the obligation in order to clearly disclose that no part of the obligation is to be paid or satisfied from general taxation. Absent such

a showing in this case, it is inevitable that to pay off the rentals a resort to general taxation is or may be necessary; and, therefore, the special fund doctrine cannot here obtain. This feature of the doctrine is well expressed under the quotation above set out taken from the case of Brash v. State Tuberculosis Board, supra, which we requote to this extent: "And, in the case of enterprises authorized by the Legislature to be embarked upon through state agencies, a particular scheme of financing will be held to be valid only where it is clearly demonstrable from the specific terms of the financing proposal itself that no tax burden or pecuniary liability of the state to appropriate or pay for the indebtedness about to be incurred will ever arise, or be looked to as security, in whole or in part, for repayment of the borrowed moneys."

Aside from the claim that the Connelly case is decisive of this case, appellee argues for the validity of the Act and the proposed indebtedness upon the proposition that the rentals to be paid by the various state agencies or activities amount to current administrative expense and are, therefore, properly payable, in whole or in part, out of moneys realized from general taxation. This, of couse, has no connection or relation to the special fund doctrine. This matter is presented to us from the following taken from appellee's brief:

"Here the state agency and departments pay only so long as the rent is commensurate with the services rendered, and may vacate if it becomes exhorbitant. True, the Commission is to charge not less than such rates as will be sufficient to take care of the bonds, interest, maintenance, etc., but it cannot charge in any event more than the just and reasonable rental considering the value of such use and occupancy measured by the law of supply and demand. It cannot arbitrarily charge less than needed, to the prejudice of bondholders, but it cannot enforce more than a just and reasonable rent. Under these terms, there results a true contract for services rendered from year to year only, for the payment of which either from property taxes, excise taxes, fees or any other public funds is proper.

"The distinction is that if the transaction could be (and it cannot be) construed as a pledge of the funds of the department, ments to pay the bonds, then such pledge would have to be limited to non-direct tax funds under the special fund doctrine approved in the Connelly case; whereas if the lease covenants are construed as reasonable rentals contingent upon occupancy and reasonableness of rates (as they in fact are), such contractual promises cannot be deemed an absolute pledge of moneys to secure the bonds. They are, as they purport to be, contractual covenants for the use and occupancy of office space, payable from operating expenses irrespective of their source and within the holding of Raton Water Works Co. v. Raton, supra [9 N.M. 70, 49 P. 898]. There is no sort of contractual relation between the tenants and the bondholders."

To support the proposition, appellee refers us to the following cases, among others, to-wit: City of South Bend v. Reynolds, 155 Ind. 70, 57 N.E. 706, 49 L.R.A. 795; Jefferson School Township v. Jefferson Township School Building Co., 212 Ind. 542, 10 N.E.2d 608; Giles v. Dennison, 15 Okl. 55, 78 P. 174; Waller v. Georgetown Board of Education, 209 Ky. 726, 273 S.W. 498; Weaks v. Board of Education, 282 Ky. 241, 137 S.W.2d 1094; Texas National Guard Armory Board v. McGraw, 132 Tex. 613, 126 S.W.2d 627; Geboski v. Montana Armory Board, 110 Mont. 487, 103 P.2d 679; Gemmill v. Calder, 332 Pa. 281, 3 A.2d 7; Kelley v. Earle, 325 Pa. 337, 190 A. 140; and Raton Water Works Co. v. Raton, 9 N.M. 70, 49 P. 898. To the contrary, appellant cites Kelley v. Earle, 320 Pa. 449, 182 A. 501; Brown v. City of Corry, 175 Pa. 528, 34 A. 854; Billings v. Bankers' Bond Company, 199 Ky. 490, 251 S.W. 643; Baltimore & O. S. W. R. Co. v. People, 200 Ill. 541, 66 N.E. 148; Earles v. Wells, 94 Wis. 285, 68 N.W. 964, 59 Am.St.Rep. 886; Spilman v. Parkersburg, 35 W.Va. 605, 14 S.E. 279; City and County of San Francisco v. Boyle, 195 Cal. 426, 233 P. 965; Mahoney v. San Francisco, 201 Cal. 248, 257 P. 49; and other cases. When we consider the facts in full, we fail to see wherein this proposition has any application in our case. However, since both parties have devoted to it a major portion of their argument, we shall give the matter our consideration. The cases cited hold that a lease for a term of years for use of property by a city, school district, etc., which does not involve purchase of the property leased and the yearly rental under which can be met within the constitutional limits of annual indebtedness, and wherein such city, etc., may at any time recede without involving any financial liability in so receding, is valid. This is based on the idea that the service charges by the lessor are earned only year by year. The same has been held as to a state or state institution if the annual rental is to be met by legislative appropriation. Under such an arrangement, the city, etc., is not legally bound to continue payments of rentals, or to raise money therefor, nor in the case of the state, is the legislature bound to make appropriation therefor. It was under this view that the leases were upheld as mentioned in the cases of Texas National Guard Armory Board v. McGraw, Geboski v. Montana Armory Board, Gemmill v. Calder, supra, and Kelley v. Earle in 325 Pa. 337, 190 A. 140. In the said case of Geboski v. Montana Armory Board, supra, it was specifically provided in the lease arrangement that the legislature was not bound to make any appropriation. In the case of Gemmill v. Calder, supra [332 Pa. 281, 3 A.2d 9], the court required elimination of a term in the contract giving the lessor the right to collect in case of default in this language:

"The agreement provides that, upon default, the Authority 'may at its option take such legal action to collect the same as it may deem proper', with interest at

the rate of six per cent, an attorney's fee and a penalty of ten per cent. This provision must be eliminated from the contract; our determination is based upon the fact that this is done."

In our above mentioned case of Raton Water Works Company v. Raton, specific performance was sought against the city of Raton to enforce a long-term lease for use of hydrants. In denying relief, we said [9 N.M. 70, 49 P. 908]:

"We do not hold that the contract in question here creates an indebtedness as contemplated by our statute or the act of congress, by which the complainant agreed to furnish and supply water from 44 hydrants, for which defendant agreed to pay semiannually the sum of $1,962.50 or $3,925 per year for 25 years, making a total sum for that time of $98,125. If that were an indebtedness, the contract would be clearly void, because it would be for an indebtedness beyond the limitation of four per centum prescribed by the act of congress approved July 30, 1886, as well also as the statutory limitation. The complainant might fail to perform its part of the contract, or the defendant might forfeit its rights to receive the water some time during the continuance of the contract, and on the occurring of either event the contract would, on a proper showing, be declared at an end, and no further obligation would rest on either party to the contract. It does not constitute an indebtedness for the whole amount in præsenti. It is a continuing contract from year to year, and is binding on both par-

ties, so long as the conditions therein are not broken."

Aside from the five cases last mentioned, the other cases cited by appellee under the proposition now under discussion involve as ultimate objective the acquiring by cities, etc., of buildings and structures erected for their use but at expense of another. In the main, under such cases, the arrangements were in form of lease with option to buy and with provision that the rentals paid should apply on the purchase price. Whether we agree with the reasoning or not, such arrangements were upheld as distinguishable from contracts to purchase. They were upheld as leases within what has here been said. In all of such cases as well as in the above cases cited contra, the buildings or structures were to be constructed by a person or persons, natural or artificial, who as such were entirely independent of the city, etc. Such persons were to own the structures until paid for and only upon being paid for would the city, etc., become the owner. That is *not* the situation in our case, and that is why we do not believe that this proposition has any application under our case. Under the Act in question, the state will borrow the money with which to construct the capitol state building, and it is from the proceeds of such borrowing that the state itself proposes to construct the building. It is not a case of the state merely leasing property for its use or of contracting to purchase property. Having contracted a debt in the manner mentioned, absent any special

fund, the only way the state could secure payment thereof and of interest to accrue thereon would be by tax levy as required by section 8 of article 9 of our Constitution. The Act does not provide for any such tax levy. In the case of City of South Bend v. Reynolds, supra [155 Ind. 70, 57 N.E. 707, 49 L.R.A. 795], though the lease therein mentioned was upheld, the court says, citing cases:

"While the rent for suitable offices for city officers is an ordinary and necessary expense, the *erection* of a city hall or a building *for the use* of the city officers is *not* in any sense an *ordinary* and *necessary* expense, but is an extraordinary one. Grant v. City of Davenport, 36 Iowa 396, 403. There is a clear and plain distinction between a contract for the use of rooms or a building for city purposes, and the *erection by the city* of a building to be used for such purposes. The one is an ordinary and necessary expense while the other involves municipal ownership of the building or rooms, and the means of furnishing the offices, and is an extraordinary expense." (Italics ours.)

■ If we could hold that the Capitol State Office Building Commission was independent and apart from the state, and not merely an agent of the state, and that the building was to be in its ownership and that the state would acquire ownership only when, by compliance with the rental agreements, the proposed indebtedness of the commission would be satisfied (which we cannot hold), then we would be im-

pelled to hold, following our case of Palmer v. City of Albuquerque, 19 N.M. 285, 142 P. 929, 934, L.R.A.1915A, 1106, that the rentals to be paid under the leases would not be current expense. The financial plans under that case were very similar to the plans under the cases of City of South Bend v. Reynolds and Waller v. Georgetown Board of Education, supra. The facts were as follows: In order to complete construction of a city hall the city of Albuquerque proposed to convey its land with the uncompleted structure thereon to a bank; the bank was to furnish money necessary to complete the structure; the city was thereupon to lease the building from the bank for ten years with option to repurchase; the rental under the lease was to be applied in reimbursing the bank with interest; and thereupon the bank should reconvey the property to the city. We rejected the plan holding that an equitable mortgage thereby ensued and we further said:

"In so holding we desire to be understood as construing the present case as one *not* coming under the principle applicable to those cases where current expense of municipal administration is involved, and no payment or liability to be assumed or required until the services or supplies be furnished, and then met by annual appropriation and levy of taxes." (Italics ours.)

The State Board of Barber Examiners and the other state departments mentioned in Section 9 of the Act are but agencies of

the state, so that the lease agreements would be the contracts of the state. Subject only to the one condition set out in said section, the state would be *obliged* to continue payment of rentals until the indebtedness of the Commission was satisfied. This would mean, so long as the agencies did not recede from the lease agreements under the one specified condition, that future legislatures would be bound to provide appropriations for payment of rentals. Such would not be within the conception of expense under a lease as current expense; and a legislature cannot tie the hands of another legislature. State ex rel. v. Griffith, 135 Ohio St. 604, 22 N.E.2d 200; Boswell v. State, 181 Okl. 435, 74 P. 2d 940. See, also, on this proposition generally, *City and County of San Francisco v. Boyle*, 195 Cal. 426, 233 P. 965, and Reynolds v. City of Waterville, 92 Me. 292, 42 A. 553.

▮ There is another cogent reason why the proposed lease arrangements between the agencies and the Commission cannot be held to be leases under the proposition we have just discussed, and why they are not leases for purpose of setting up a special fund out of the moneys obtained thereunder which we have heretofore discussed. If the Commission is only an agency of the state, and the state Board of Barber Examiners, et al., concededly being agents of the state, the situation is that the state would be dealing with itself. Lease agreements are but contracts and it is elementary that the creation of a contract requires at least two parties. There being only one party to the lease arrangements, no contracts result. The lease agreements, therefore, are merely devices which cannot be upheld except only under the theory of a special fund being created out of moneys to be raised whereby the agencies would be enabled to pay rentals, which theory we have also discussed. Appellee calls our attention to the case of Scott et al. v. Alabama State Bridge Corporation, 233 Ala. 12, 169 So. 273, to show that a lease arrangement between two state agencies was upheld. In substance for our purposes, we may say that the following were the facts: The State Bridge Corporation had issued bonds the proceeds whereof were to be used by it in constructing toll bridges throughout the state and which bridges formed a part of the highway system of the state; the bonds issued by the Corporation were secured by special funds principally from tolls collected from users of the bridges; because of the economic depression, the toll collections were insufficient to pay off interest and principal of some of the bonds maturing and the Corporation became in default in its payment thereof; to relieve the situation it was proposed that the corporation lease its toll bridges to the State Highway Department for thirty years for an annual rental of not to exceed $300,000; out of such rental the Corporation felt that it would be enabled to fulfill its obligations to its bondholders; a declaratory judgment was sought; the State Highway Department from funds realized by it through excise taxes was able to pay the rental; and both

the Corporation and the State Highway Department were state agencies, designed' for public service. The lease plan was approved. Considering the purpose to be attained, the leasing arrangement under said case could hardly be a lease within the strict sense of the term. It amounted to a plan or a device whereby new moneys likewise derived from special funds (and not through ad valorem taxation) were to be obtained to pay off the special fund obligations of the Corporation. It was in effect a shift from one special fund to another.

We have said that the Capitol State Office Building Commission is only an agent of the state and that the debt to accrue from the sale of debentures would be that of the state and that the building would be presently owned by the state. A further review of the Act confirms our views in these respects. As we have shown, under the title of the Act it is for the purpose of providing and equipping a state office building. Section 3 of the Act designates the Commission as an agency of the state. By Sections 4 and 8, the proceeds realized from sale of debentures are not to go into the hands of the Commission, but into the custody of the State Treasurer to be covered into State Office Building Fund. By Section 2 the State, not the Commission, makes appropriation to construct and equip the building out of the moneys, not in hands of the Commission, but out of the State Office Building Fund. How could the state appropriate money it did not own, and how could it own these moneys if it had not borrowed them? Un-

der Section 4 the building is to be constructed on property of the state presently owned or to be acquired. By said section 4, the expenditures in connection with the construction and equipment of the building are not to be paid out of any moneys. held or owned by the Commission, but "solely and only from the State Office Building Fund". Under Section 5, the debentures are to be issued by the Commission, but if this is something to be done exclusively by the Commission then why is it required that the debentures shall be countersigned by the Treasurer of the State, and why is it not required that the coupons be signed by the Commission? Under said Section 5, it is provided only that the facsimile signature of the State Treasurer be affixed to the coupons. Under said Section 5, it is specified that the debentures shall be exempt from certain taxation. How could they be so exempt if they represent debt of the Commission as an entity separate and apart from the state? Under our Constitution, Section 3 of Article VIII, only bonds of the state can be so exempt. Nowhere in the Act is ownership of the building vested in the Commission. By Section 9, rentals under the so-called leases are to be paid not to the Commission, but into the State Treasury to be likewise placed in the State Office Building Fund. Under Section 8 as to moneys coming into the State Office Building Fund, as proceeds from sale of debentures, to disburse the same requires warrant drawn by the State Auditor, who is another agent of the state. If such moneys belong to the Commission as an entity,

separate and apart from the state, why should it be necessary that warrants to use such moneys should be drawn by a state officer? Maintenance, upkeep and repair expenses may be paid for in same manner as for "other state owned buildings." Section 10.

It being clear that the building is to be presently owned by the state, these queries become pertinent: As to the condition set out in Section 9 of the Act under consideration whereby the agencies may withdraw from the lease agreements, to-wit, "provided it is shown that the terms and conditions of such use and occupancy and the amount required to be paid therefor is unjust and unreasonable, considering the value of such use and occupancy, and that equally desirable facilities are available in privately owned buildings upon more advantageous terms", if the building is owned by the state immediately upon its erection and constructed by it with its money derived from sale of debentures, can there be any sensible meaning to such condition? What right or occasion would there be in such agencies to seek other quarters and put the state to expense when the state had already provided quarters for them?

■ Since the debt from the issue of debentures is to be a state debt, and no Special Fund having been set up to secure it, the following expressions in Section 8 of the Act are inapt, to-wit: "Such debentures shall constitute only the corporate obligations of said Commission"; and "It shall be plainly stated on the face of each of such debentures that same does not constitute an indebtedness of the State of New Mexico within the meaning of any constitutional provision or limitation." Such expressions can be of no force because the basic purpose, substance and plan of the Act, and the detailed provisions looking to the accomplishment of such purpose, show differently. Such matters are for judicial and not legislative determination. People v. Barrett, 373 Ill. 393, 26 N.E.2d 478; Boswell v. State, 181 Okl. 435, 74 P.2d 940; Wilder v. Murphy, 56 N.D. 436, 218 N.W. 156.

In argument and under the briefs both parties to this action have dwelt with great emphasis on the cases of Alabama State Bridge Corporation v. Smith, 217 Ala. 311, 116 So. 695; Scott v. Alabama State Bridge Corporation, 233 Ala. 12, 169 So. 273; Brash v. State Tuberculosis Board, 124 Fla. 167, 167 So. 827; Brash v. State Tuberculosis Board, 124 Fla. 652, 169 So. 218; Kelley v. Earle, 320 Pa. 449, 182 A. 501; and Kelley v. Earle, 325 Pa. 337, 190 A. 140. Time will not permit us to comment on these cases, but we are confident that careful analysis will show that in the main they are in harmony with what we have here set out.

■ Other important questions have been presented but what we have covered is sufficient for the purpose of our decision. Since the contemplated indebtedness under said Chapter 62, New Mexico Statutes of 1941, results in a debt in the constitutional sense, and not being of the

character specified in Section 7 of Article IX of our Constitution, and same not having been submitted for approval of the electorate (and such not being intended) and no tax levy having been provided for, the action of the lower court in sustaining appellee's demurrer and in rendering judgment for plaintiff-appellee was error. Accordingly, the judgment of the trial court is reversed and the cause remanded with directions to overrule the plaintiff's demurrer to defendant's answer, and for further proceedings not inconsistent with the views herein expressed.

It is so ordered.

BRICE, C. J., SADLER, and MABRY, JJ., concur.

BICKLEY, Justice (concurring specially).

I concur in the result. I agree with the conclusions announced by Judge FRENGER, except the assumption that under some circumstances a debt may be contracted by or on behalf of this state other than those specified in Sec. 7 of Art. 9 of our Constitution without compliance with the provisions of Sec. 8 of said Article 9.

Such assumption may be supported by the holding in the Connelly case, supra, but I think both the prevailing Justices and the dissenting Justice in that case missed the true meaning of the constitutional limitations upon the power of the legislature to authorize the creation of State debt.

As we are recurrently called upon to consider legislative enactments designed to authorize debts to be contracted by or on behalf of the State without submission of such enactments to the qualified electors of the State, I am convinced that the constitution makers intended to prohibit the creation of State debts except those mentioned in Sec. 7 of Article 9, unless they are repayable from the proceeds of a property tax levy, and then only with the approval of the qualified electors of the State.

The constitution makers, who included the electors, knew that the debt contracting power "is inherent in the state, and may generally be exercised through its Legislature without let or hindrance, except in so far as limited by the Constitution." State v. Connelly, supra, citing Asplund v. Alarid, 29 N.M. 129, 219 P. 786.

So they set about to impose limitations upon this power. Section 7 of Article 9 contains both a recognition of this inherent power and placed a limitation upon it. That section recognizes an unlimited power to "contract debts to suppress insurrection and to provide for the public defense". The power to borrow money to meet casual deficits and for necessary expenses is limited to two hundred thousand dollars. But there are no limitations imposed as to manner of creation of the debts or of providing for the repayment thereof.

(All laws authorizing the creation of public debt are specifically immune to referendum, "except as in this constitution otherwise provided". Sec. 1, Art. 4 of our Constitution.) This is followed immediately by the opening sentence of Sec. 8, Art. 9, which says: *"No debt* other than those specified in the preceding section shall be contracted by or on behalf of the state, unless \* \* \*". (Emphasis mine.)

Then follow the provisions as to the manner in which other public debts may be created. One of these is that there must be an approval of a majority of the qualified electors.

Attention is directed to the declaration in Sec. 8 of Art. 9 that no "law" authorizing a permitted debt other than those specified in Sec. 7 of Art. 9 *"shall take effect"* until it shall have been submitted to the qualified electors, etc."

This language seems to be related to similar language in Sec. 1 of Art. 4 as to suspension, etc., of certain laws upon petition of the electors.

As I understand Sec. 1 of Art. 4, laws not falling within the exceptions named therein may be "suspended." With respect to laws authorizing permitted public debt, such laws shall not "take effect" until the electors shall have had an opportunity to exercise the legislative power reserved in them by Art. 4, Sec. 1. No petitions disapproving or suspending such a law are required. Such a law simply does not· go into effect because that other branch of the legislature, viz., the people, have not approved it.

In Re Atchison, T. & S. F. Ry. Co., 37 N.M. 194, 20 P.2d 918, 921, we said: " 'The expression of one thing is the exclusion of another.' 'Broom, in his Legal Maxims, says that no maxim of the law is of more general and uniform application; and it is never more applicable than in the construction and interpretation of statutes. Whenever a statute limits a thing to be done in a particular form, it necessarily *includes in itself a negative, viz., that the thing shall not be done otherwise.'* 19 Cyc. 23."

I think this maxim has a special application here.

It seems to be conceded by counsel that the plan proposed will create a debt, but not the kind of debt referred to in Sec. 8 of Art. 9.

I am satisfied with the forceful logic and reasoning of Judge FRENGER to the effect that what is proposed, if effectuated, would be a debt in the sense described in said Sec. 8 of Article 9; but I go further and say that the kind of debts which may be contracted in the manner mentioned in said Sec. 8 of Art. 9 are the only kind of debts which can be contracted for or on behalf of this State, except those mentioned in Sec. 7 of Art. 9, and no one contends. in the case at bar that the debts proposed would be within the objects sanctioned in said Sec. 7 of Art. 9.

I reserve my opinion as to whether a contemplated scheme of embarkation by the state upon new capital ventures, not sanctioned by Sec. 7 of Art. 9 and which are repayable solely out of revenues derived entirely from the income of the venture itself, may create a public debt in any sense of the word.

An attempt has been made in some of our decisions to distinguish between public debts "in a constitutional sense" and other public debts. I think there is only one kind of public debt not prohibited, and that is the kind recognized in sections 7 and 8 of Article 9 of our constitution.

I assert that state debts are public debts.

"The terms 'public debt' and 'public securities,' used in legislation, are terms generally applied to national or state obligations and dues, and would rarely if ever be construed to include town debts or obligations." Morgan v. Cree, 46 Vt. 773, 786, 14 Am.Rep. 640.

Article 4, Sec. 1 says: "The people reserve the power to disapprove, suspend and annul any law enacted by the legislature, except * * * laws providing for * * * the public debt * * * except as in this constitution otherwise provided."

It cannot be doubted that laws enacted by the legislature to contract state debts to meet casual deficits, or failure in revenue, or for necessary expenses, or to suppress insurrection and to provide for the public defense, referred to in Sec. 7 of Art. 9, are public debts. Although there is no restriction as to the method of repayment thereof, being laws providing for the public debt, they are excepted from the referendum provisions of Art. 4, Sec. 1. The only laws which the legislature may enact providing for the public debt, and which are not excepted from the immunity from referendum because it is "otherwise provided" are those providing for the public debt described in Sec. 8 of Art. 9, which specifically requires a referendum.

Thus there is sometimes presented the astounding contention that there may be a public debt not for the objects or work specified in Sec. 7 of Art. 9 or created in the manner provided in Sec. 8 of Art. 9, which may be contracted for or on behalf of the state without a referendum, merely because such debts may be repaid by taxes other than property taxes.

We are then confronted with the inquiry as to why the constitution-makers would provide for a petition invoked referendum on a large number of legislative enactments, many of them of minor importance, and yet deny referendum as to a law creating a public debt in unlimited amount not for the emergent objects mentioned in Sec. 7 of Art. 9, and pledging for its repayment the proceeds of every kind of a tax except an ad valorem or property tax. I do not impute to the constitution makers such an absurd intention.